380 F.2d 661
 William R. JACKSON, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
William R. and Alice J. JACKSON, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
CLEVELAND CHAIR COMPANY, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 17023-17025.
 United States Court of Appeals Sixth Circuit.
 July 14, 1967.
 
 Sol Neil Corbin, New York City, for petitioners, Philip Zimet, Greenman, Zimet, Haines, Corbin & Goodkind, and Nahum L. Gordon, New York City, on the brief, Richard P. Jahn, Tanner & Jahn, Chattanooga, Tenn., of counsel.
 Robert H. Solomon, Atty., Dept. of Justice, Washington, D. C., for respondent, Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Jonathan S. Cohen, Robert H. Solomon, Attys., Dept. of Justice, Washington, D. C., on the brief.
 Before WEICK, Chief Judge, EDWARDS, Circuit Judge, and CECIL, Senior Circuit Judge.
 EDWARDS, Circuit Judge.
 
 
 1
 These cases are appealed from decisions by the United States Tax Court. With some important modifications, the Tax Court upheld the Commissioner of Internal Revenue's redeterminations of income and corporation surplus profits taxes concerning the individual and corporate petitioners. The net effect of the Tax Court decisions is to assess taxes, fraud penalties and interest totaling approximately $1,400,000.
 
 
 2
 The cases all arose out of profits engendered by two furniture manufacturing concerns owned by petitioners William R. and Alice J. Jackson during World War II. The substantial items at issue are income tax deficiencies, fraud penalties and interest assessed against taxpayers William R. Jackson and Cleveland Chair Company for the years 1942 through 1945. The Tax Court disallowed similar deficiencies and penalties against Alice J. Jackson on the ground that knowledge of the fraudulent transactions as to her had not been proved by clear and convincing evidence. Int.Rev. Code of 1954, § 6501(c) (1), § 7454(a); Hawkins v. Commissioner of Internal Revenue, 234 F.2d 359 (C.A.6, 1956); Drieborg v. Commissioner of Internal Revenue, 225 F.2d 216 (C.A.6, 1955).
 
 
 3
 The main thrust of these appeals is that fraud was not established as to the World War II years referred to, and hence these cases filed in 1951 were barred by the statute of limitations. Int.Rev.Code of 1939 §§ 275(a) and 276(a) (now Int.Rev.Code of 1954 § 6501(a) and § 6501(c)).
 
 
 4
 The taxpayer appellants admit that the gross sales of the two furniture concerns were understated on the books and income tax returns in the relevant years by $309,533.56 in the instance of Jackson Manufacturing Company (a sole proprietorship owned by Jackson), and by $255,844.84 in the instance of Cleveland Chair Company (a company whose stock was wholly-owned by Mr. and Mrs. Jackson). The appellants contend, however, that this entire sum was spent on materials purchased for the two manufacturing concerns at prices higher than those permitted by the Office of Price Administration. Their claim is that the black market purchases entirely offset the gross sales understatement, and hence, there was no understatement of net income or underpayment of taxes, and therefore, no fraud. Cf. Commissioner of Internal Revenue v. Johnson, 276 F.2d 110 (C.A.7, 1960).
 
 
 5
 It is, of course, settled that black market expenditures for materials employed in the production of goods for sale, even though clearly illegal, may be regarded for income tax purposes as deductions against net income. Commissioner of Internal Revenue v. Guminski, 198 F.2d 265 (C.A.5, 1952); Jones v. Herber, 198 F.2d 544 (C.A.10, 1952); Commissioner of Internal Revenue v. Weisman, 197 F.2d 221 (C.A.1, 1952); 3A Mertens, Law of Federal Income Taxation, § 21.206 (Zimet & Weiss rev. 1958).
 
 
 6
 The Tax Court here found that only $100,000 of the more than half-million-dollar unreported gross income was applied to black market purchases. Thus this finding left over $400,000 of admittedly unreported gross income unexplained and unaccounted for. It is appellant's main argument that the evidence from which the Tax Court made this finding was not the sort of "clear and convincing" evidence necessary for a finding of fraud.
 
 
 7
 We are not unimpressed with this contention. The Tax Court employed an estimate as to the total of appellant's black market purchases which was made to an Internal Revenue Agent at the first interview of appellant's office manager, W.E. Wooten. Subsequently, at trial this same witness testified strongly for appellant that every dime of the funds he withheld was spent on black market purchases. While Wooten did not deny making the estimate previously referred to, he declined at the time of trial to attempt such an estimate. If the facts referred to up to this point constituted the sole evidence of fraud, we might not conceive it to be the sort of "clear and convincing" evidence required to avoid the statute of limitations. Int. Rev.Code of 1954 § 6501(c) (1), § 7454 (a); Hawkins v. Commissioner of Internal Revenue, supra; Drieborg v. Commissioner of Internal Revenue, supra; Bryan v. Commissioner of Internal Revenue, 209 F.2d 822 (C.A.5, 1954), cert. denied 348 U.S. 912, 75 S.Ct. 289, 99 L.Ed. 715 (1955).
 
 
 8
 Jackson and his office manager both testified. They were unable to produce any records for the black market sales and they both betrayed a decidedly vague memory as to the persons, concerns and amounts involved in the over half-million-dollar black market business which Jackson asserts he engaged in.
 
 
 9
 The decisive testimony on the issue of fraud in this case, however, consists of wholly different evidence. The government proved by bank records, company checks, bank letters and testimony of bank officials, the existence during the years in question of numerous fictitious name savings accounts in the bank employed by taxpayers. Most of the names employed were variations of family names of members of Jackson's family. This evidence we believe was both admissible and highly relevant. (28 U.S.C. § 1732.)
 
 
 10
 The amounts deposited in the fictitious name accounts totaled over half a million dollars during the period 1942 to 1945. Although Jackson denied knowledge of the existence of all except one of the accounts, government proofs established that all of the deposits in these accounts which could be identified (other than interest credits), were deposits of checks of customers of the Jackson Manufacturing Company and the Cleveland Chair Company. These checks had been endorsed by these two companies for deposit. Identifiable deposits of checks in these accounts in payment of Jackson or Cleveland sales invoices totaled over $400,000 for the years in question. There were numerous other such checks which had been similarly endorsed and cashed.
 
 
 11
 Further, the Tax Court found that $184,298.13 worth of withdrawals from these fictitious name accounts were made coincident as to time and amount with deposits to William R. Jackson's personal accounts (or to accounts for the benefit of Jackson or Mr. and Mrs. Jackson).
 
 
 12
 Jackson denied personal knowledge of most if not all of these complex banking arrangements. He testified that he gave one Dodd, the manager of the bank where these fictitious accounts were kept, very great authority in handling his funds. But as we read this record, the Tax Court had every reason to consider Jackson's denials much more an assertion of lack of detailed memory of the form of the transactions than proof of ignorance of their substance.
 
 
 13
 Jackson admitted personal and close supervision of his two businesses. While he testified that Wooten had suggested the mechanics of pulling invoice copies and customer checks out of the company records in order to produce unrecorded cash, and while he and Wooten both testified that Wooten had authority to cash company checks and pay for black market purchases, it is, we believe, very significant that the "pulled" invoices were kept in the righthand bottom drawer of Jackson's desk. These were the crucial documents for control of this whole conspiracy.
 
 
 14
 The findings of fact of the Judge of the Tax Court spell out the evidence of fraud in great detail. We have no ground for determining that any of them are "clearly erroneous," (see Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960)) and we incorporate them herein by reference.
 
 
 15
 For avoidance of the statute of limitations, the Commissioner need only prove that some portion of the tax deficiency is due to fraud. Int.Rev.Code of 1939 §§ 293(b) and 276(a) (now Int. Rev.Code of 1954 §§ 6653(b) and 6501 (c) (1)). Toledano v. Commissioner of Internal Revenue, 362 F.2d 243, 247 (C.A.5, 1966); Kreps v. Commissioner of Internal Revenue, 351 F.2d 1, 6 (C.A. 2, 1965); George v. Commissioner of Internal Revenue, 338 F.2d 221, 223 (C.A.1, 1964).
 
 
 16
 We believe the proofs recited and those incorporated by reference establish by clear and convincing evidence that the taxpayers fraudulently withheld substantial tax sums with intent to evade taxes in each of the years 1942 through 1945.
 
 
 17
 As we have noted, the burden of proving fraud to avoid the statute of limitations must be borne by the Commissioner by clear and convincing evidence. But once fraud is established as to a particular tax return in a particular year (otherwise barred by limitations), the burden of proof for setting aside the redetermination of taxes by the Commissioner is on the taxpayer. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); Helvering v. Taylor, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935).
 
 
 18
 The taxpayers, however, vigorously assert that since the Tax Court allowed $100,000 of black market purchases as a deduction against gross income, and to that extent overturned the Commissioner's redetermination, this fact shifted the burden of proof of total taxes due back to the Commissioner. It seems clear to us, however, that the burden of proving the amount of the claimed black market deductions was on the taxpayers. Burnet v. Houston, 283 U.S. 223, 227, 51 S.Ct. 413, 75 L.Ed. 991 (1931); Reinecke v. Spalding, 280 U.S. 227, 233, 50 S.Ct. 96, 74 L.Ed. 385 (1930); Bryan v. Commissioner of Internal Revenue, supra. The effect of the Tax Court holding is that the burden of proof of those deductions was carried only to the extent of $100,000. We recognize, of course, that it was a government witness who quoted the estimate which the Tax Court ultimately employed. But the net effect of appellant's proofs was that there were black market purchases which offset the admitted understatement of gross income. If the proofs establishing the $100,000 deduction allowed by the Tax Court as an offset to the gross income be less than definitive, we still cannot hold from this record that it is "clearly erroneous." Harris v. Commissioner of Internal Revenue, 174 F.2d 70, 72-73 (C.A. 4, 1949). Indeed, if there be error in the estimate, it appears to this court that the taxpayer got the benefit thereof. And, of course, the fact that the Commissioner erroneously failed to allow this $100,000 item did not mean that other determinations not dependent thereon were deprived of the presumption of correctness. Hoffman v. Commissioner of Internal Revenue, 298 F.2d 784, 788 (C.A.3, 1962); George v. Commissioner of Internal Revenue, supra.
 
 
 19
 At the oral hearing of this case, this court was particularly concerned about the lengthy delay in the filing and processing of these tax cases. Testimony of witnesses in this trial, however, allows the inference that these cases grew out of Internal Revenue investigations of the tax returns of Dodd, the bank manager previously referred to. In E.C. Dodd, T.C.Memo 1962-235 (Oct. 5, 1962), the Tax Court held Dodd's federal income tax returns for the years 1942 to 1949 to have been fraudulent, with intent to evade taxes.[1] The record clearly establishes that the taxpayers gave no hint of the false accounting practices and made no claim as to black market purchase offsets until the initiation of this investigation in 1951. Subsequent delays apparently were frequently the result of taxpayers' requests.
 
 
 20
 The Tax Court Judge wrote a careful and detailed opinion which we have reviewed. It covers added details and issues as to which we see no need for repetition.
 
 
 21
 The opinion and the judgment of the Tax Court are affirmed.
 
 
 
 Notes:
 
 
 [1]
 Against this background, neither party elected to call Dodd to testify, although the Tax Court Judge noted that Dodd was present in the Courtroom all during the trial of the instant case