ESTATE OF WILLIAM KAHR (A.K.A. WILLIAM CARR), DECEASED, JAMES F. DALTON, EXECUTOR, AND MARY ZANGERLE (FORMERLY KNOWN AS MARY K. KAHR AND MARY CARR), SURVIVING WIFE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1281–65. Filed September 29, 1967.

James F. Dalton, pro se.
*William F. Chapman* and *Larry Kars*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioners' income taxes and additions to taxes as follows:

| Year | Deficiency | Additions to tax sec. 6653(b)[1] |
| --- | --- | --- |
| 1958 | $16,681.95 | $8,340.98 |
| 1959 | 8,893.24 | 5,462.64 |

[1] All statutory references are to the Internal Revenue Code of 1954.

The issues to be determined are: (1) Whether in each year the taxable income of William Kahr was understated by omitting partnership income embezzled by him, and by omitting a part of his distributive share of partnership income, and if so, (2) whether any part of the deficiency for each year was due to fraud with intent to evade the tax. A claimed medical expense deduction for 1958 is dependent upon our holding as to (1) above, because of the limitation imposed by section 213(a)(1).

FINDINGS OF FACT

Some of the facts have been stipulated and, with the one modification noted, are so found.

Petitioner Mary Zangerle (formerly known as Mary K. Kahr and Mary Carr) and William Kahr (also known as William Carr) were husband and wife during the calendar years 1958 and 1959. William Kahr died in January of 1960. Joint Federal income tax returns were filed for William and Mary Kahr for 1958 and 1959 with the district director of internal revenue, Albany, N.Y., however, the 1959 return was filed out of time, after William Kahr's death, and was signed by Mary Kahr and for William Kahr by James F. Dalton, the executor of his estate.

At the time the petition in this case was filed, the petitioner, Estate of William Kahr, James F. Dalton, executor, had its principal office in Albany, N.Y. The petitioner Mary Zangerle was residing in Boynton Beach, Fla.

In 1958 and 1959, William Kahr (hereinafter referred to as Kahr) held a 50-percent partnership interest in the Hamilton News Co. (hereinafter sometimes called News, or the company). The other 50-percent interest was held by Leon Mohill. News was engaged in the newspaper and periodical distribution business in Albany, N.Y.

During the years in issue and for many prior years, Kahr was the managing, resident partner who ran this business. Leon Mohill lived, and had other businesses in Pittsfield, Mass., about 35 miles away, and he came to the News' offices only once or twice a year.

Charles Fruscione (hereinafter sometimes referred to as Fruscione) was manager of News and under the direct supervision of Kahr. His primary duty was to see that the company operations were running smoothly. This included supervising the daily receipts and disbursements of cash.

In 1958 and 1959, Kahr diverted large amounts of partnership income from the partnership to himself. With the aid of Fruscione, he systematically kept this income from being reported on the books and records of News.

Normally the bookkeeper for the company, Ann Hall (hereinafter sometimes referred to as Hall), opened all mail, recorded all checks

received on a daily cashier's report, and posted the amounts to the proper ledger accounts. However, through careful control of the incoming mail, Kahr was able to have checks removed before they could be recorded.

The checks so removed were for the most part from three companies: Union News Co., Holland Paper Stock Co., Inc., and Time, Inc. A single check from Caterpillar Tractor Co. was also removed.

On orders from Kahr, Fruscione sorted all mail before it was given to Hall for processing. When he came across a letter from one of the above companies, he would pull it out and then return the rest of the mail to Hall unopened. Fruscione held the checks thus pulled until, on an order from Kahr, he would cash the accumulation and hand the proceeds to Kahr.

For a period of about 8 weeks beginning in September 1959, both Fruscione and Kahr were ill and unable to be at the office. During this time, Hall was ordered to send a delivery boy to Kahr's home each day with the unopened mail. Hall subsequently received at least a part of the mail back unopened. During the latter part of 1959 proceeds from six checks sent by Union News, and totaling $14,821.62, did get to Hall for processing and recording on the company records.

As a result of Kahr's systematic interception of the companies' mail, checks in the following total amounts were sent to News, but were embezzled by Kahr, and not recorded on its books and records.

|  | 1958 | 1959 |
|---|---|---|
| Union News Co | $37, 881. 31 | $19, 568. 55 |
| Holland Paper Stock Co., Inc | 834. 32 | 2, 259. 56 |
| Time, Inc | 1, 650. 00 | 1, 650. 00 |
| Caterpillar Tractor Co | | 30. 00 |

News kept no records for the amounts due it from Holland Paper, Caterpillar Tractor, or Time, Inc., because these companies were trusted to keep accurate records and periodically pay what they owed. Records were kept for amounts due from Union News Co., and regular customers' billing statements therefor were made up by News' billing department.

Normally copies of customers' billing statements were given to Hall who used them as an accounts receivable control ledger. In the case of Union News, however, on order from Kahr, Fruscione received the copy instead of Hall. These copies were kept separately filed in Kahr's office until late 1959 or early 1960, when Kahr ordered Fruscione to destroy them, and he did so.

At all times Fruscione acted under Kahr's orders. At one time he questioned the propriety of carrying out the orders to intercept checks and Kahr told him "to mind * * * [his] own business." As soon as Kahr died, Fruscione discontinued the practice of pulling checks and all checks received thereafter were recorded on News' books.

Upon the death of Kahr, Leon Mohill, Kahr's partner, became the sole owner of News. Prior to this time, Mohill had no direct contact with the daily operations of News and did not participate in any of the transactions detailed above.

The company's partnership income tax returns for the years 1958 and 1959 were prepared by certified public accountants from the company's books and records, and consequently they understated income by the amounts which Kahr had embezzled.

The 1958 partnership return was signed by Kahr as partner. This return showed Kahr's share of ordinary income to be $11,715.70 and Kahr used that figure as his total adjusted gross income on the joint return filed by himself and Mary Kahr for the year 1958. At the time he filed such return, Kahr knew that partnership income was understated by the amount he had embezzled, and that his share of the partnership income was understated.

The 1959 partnership return was signed by Leon Mohill on April 16, 1960, which was subsequent to Kahr's death. The return showed Kahr's share of partnership income to be $16,065.95 and that amount was used as Kahr's distributive share on the joint return filed for him and Mary Kahr for the year 1959. This return was signed by James F. Dalton as executor of Kahr's estate and by Mary Kahr. It was dated May 16, 1960, and filed on May 18, 1960.

Respondent's statutory notice of a deficiency showed the following adjustments to petitioners' 1958 and 1959 returns:

Taxable Year Ended December 31, 1958

ADJUSTMENTS TO INCOME

| | | |
|---|---:|---:|
| Taxable income as disclosed by return | | $4,100.45 |
| Unallowable deductions and additional income: | | |
| (a) Partnership income | $20,702.81 | |
| (b) Embezzlement income | 20,182.82 | |
| (c) Medical expenses | 275.03 | 41,160.66 |
| Taxable income as corrected | | 45,261.11 |

EXPLANATION OF ADJUSTMENTS

(a) and (b)   It has been determined that the gross income reported on your income tax returns for the years 1958 and 1959 was understated in the following amounts:

| | 1958 | 1959 |
|---|---:|---:|
| Partnership income (Hamilton News Co.) | $20,702.81 | $12,274.06 |
| Embezzlement income | 20,182.82 | 11,754.05 |
| Totals | 40,885.63 | 24,028.11 |

(c) The deduction claimed for medical expenses in the amount of $275.03 is eliminated inasmuch as the payments do not exceed the statutory limitations, after giving effect to the above adjustments increasing adjusted gross income.

*          *          *          *          *          *          *

Taxable Year Ended December 31, 1959

ADJUSTMENTS TO INCOME

| | | |
|---|---:|---:|
| Taxable income as disclosed by return | | $8, 662. 42 |
| Unallowable deductions and additional income: | | |
| (a) Partnership income | $12, 274. 06 | |
| (b) Embezzlement income | 11, 754. 05 | 24, 028. 11 |
| | | |
| Taxable income as corrected | | 32, 690. 53 |

EXPLANATION OF ADJUSTMENTS

(a) and (b)   See similar items for year ended December 31, 1958.

Respondent determined the deficiency in Kahr's distributive share of partnership income as being one-half of the sum of the embezzled checks plus one-half of disallowed partnership expenses of $1,040 in each of the years in issue. The embezzlement income was determined as being the other half of the purloined checks.

Fraud penalties under section 6653(b) of the Code were also determined for each year in issue, and for 1959 the "underpayment" to which the 50-percent penalty was applied was determined to be the corrected tax liability (sec. 6653(c)) because the 1959 return was not timely filed.

Part of the deficiency determined for the year 1958 was due to fraud with intent to evade the tax. No part of the deficiency determined for the year 1959 was due to fraud with intent to evade the tax.

OPINION

Although respondent has the burden of proving fraud (sec. 7454 (a)), the presumption of correctness still attaches to the amounts of the determined deficiencies in income taxes. *Henry S. Kerbaugh*, 29 B.T.A. 1014, affirmed per curiam 74 F. 2d 749. Respondent has not relied upon this presumption here, but has presented evidence which clearly and overwhelmingly shows that Kahr diverted large sums of partnership money to his own use which were not reported on the joint returns filed for 1958 and 1959.

Petitioners called no witnesses and have favored us with no briefs. In cross-examining respondent's witnesses, petitioners attempted to show that either Leon Mohill or Charles Fruscione had received the proceeds of the purloined checks, but they failed to do so.

Respondent had determined that these same proceeds were taxable to Fruscione, and that case and the instant case were consolidated for trial before this Court. At the conclusion of such trial, we ruled from the bench that Charles Fruscione did not keep any of the proceeds of the checks cashed by him. He testified that he was ordered to, and did, turn over all the unrecorded proceeds to Kahr and we

believed him. Other evidence presented supports his testimony, i.e., the mail was sent to Kahr's house when Fruscione and Kahr were both ill, and out of the office.

If Leon Mohill is to be charged with any of the unreported income, it is incumbent upon the petitioners to show his receipt of the funds in question. The only testimony concerning Mohill's activities was that on one or two occasions he visited the News' offices, and that he could sit in Kahr's office if he wished. Such evidence is wholly inadequate.

The testimony of Fruscione and Hall was consistent and impressed us as truthful. It clearly showed that Kahr came into possession of the proceeds of the unrecorded checks, and that these amounts were not reflected in the partnership returns of the company. It is our holding that Kahr embezzled company funds in the amounts determined, and it is the law that embezzled funds are income to the embezzler in the year in which they are misappropriated. *James* v. *United States*, 366 U.S. 213.

No evidence was presented regarding medical expenditures or the disallowed partnership expenses; therefore, on the issue of deficiencies in tax, we hold for the respondent for both years.

The fraud penalties for 1958 and 1959 were determined under section 6653(b) of the Code.[2] Because of the different circumstances surrounding the filing of the two returns, we will consider them separately.

The burden of proof is on the respondent to show by clear and convincing evidence that William Kahr knowingly understated a part of his income with an intent to evade the tax. *Gromacki* v. *Commissioner*, 361 F. 2d 727 (C.A. 7, 1966), affirming a Memorandum Opinion of this Court; *Carter* v. *Campbell*, 264 F. 2d 930, 936 (C.A. 5, 1959); *Henry S. Kerbaugh, supra; M. Rea Gano*, 19 B.T.A. 518 (1930). We find that the burden has been carried for the year 1958.

As was previously pointed out, we have found the evidence to be clear and convincing that Kahr received large amounts of partnership income which were not reported on the books and records of Hamilton News, the partnership return for Hamilton News, or on Kahr's 1958 return.

The evidence is also clear and convincing that Kahr knew that he should report this income, but instead took deliberate steps to hide the fact of its receipt from public scrutiny. On his orders, checks were pulled from the morning mail before they could be recorded on the books and records of the company. The checks were not deposited in the company's account, but instead they were cashed by the trusted manager, Fruscione, who could be counted upon to "mind * * * [his]

---

[2] SEC. 6653. FAILURE TO PAY TAX.

(b) Fraud.—If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * *

own business." The proceeds of the checks were turned over to Kahr in cash, and were never recorded on the company's books and records, even though the amounts from the same payors which were not turned over to Kahr were recorded as partnership income.

In addition Kahr had a separate set of records kept for Union News Co. transactions in his own office which were not incorporated with records of the company's other customers. This gave him a private record of about 90 percent of his defalcations, and it was these records that he had destroyed.

All of the above makes it quite obvious that Kahr knew that partnership income would be understated by at least the amount of the unrecorded checks when statements were made up from the company's books and records. We conclude and hold that when he signed the partnership return and his individual return for 1958, he knew that partnership income, and his share of that income, were both grossly understated. Being an astute and experienced businessman, he knew that the unrecorded checks represented amounts which were taxable as ordinary income and that if properly reported they would have increased his taxes.

Determination of fraud is a question of fact (*Mensik* v. *Commissioner*, 328 F. 2d 147 (C.A. 7, 1964), affirming 37 T.C. 703) and the above facts clearly support a finding of fraud; consequently, we sustain respondent's determination as to 1958. *Jackson* v. *Commissioner*, 380 F. 2d 661 (C.A. 6, 1967), affirming a Memorandum Opinion of this Court; *Nathan Goldsmith*, 31 T.C. 56 (1958); *Gromacki* v. *Commissioner*, *supra*; *Arctic Ice Cream Co.*, 43 T.C. 68 (1964); *Fred Draper*, 32 T.C. 545 (1959); *Jack M. Chesbro*, 21 T.C. 123 (1953), affd. 225 F. 2d 674 (C.A. 2, 1955); *Herbert Eck*, 16 T.C. 511 (1951), affd. 202 F. 2d 750 (C.A. 2, 1953).

With one exception, the facts as to 1959 are substantially the same as those regarding 1958. The exception is that the joint return for 1959 was signed and filed by the executor of the William Kahr estate and not by William Kahr. This exception is fatal to the respondent's determination of fraud as to 1959.

One of the stipulated facts reads as follows:

1. Attached hereto, made a part hereof and marked as Joint Exhibits 3-C and 4-D are individual joint income tax returns for the years 1958 and 1959 respectively, filed by William and Mary Carr.

William Kahr, however, did not sign or file the 1959 return. It shows on its face that it was signed by James F. Dalton, executor of the Estate of William Kahr and Mary K. Kahr, and it was signed and filed several months after Kahr died in January 1960. We therefore interpret the stipulation as though it read "filed for," instead of "filed by" Kahr as to the year 1959, and find that such return was filed

by James F. Dalton, executor of the Estate of William Kahr, and by Mary K. Kahr. *William Ernest Seatree*, 25 B.T.A. 396 (1932), affd. 72 F. 2d 67 (1934); *Mead's Bakery, Inc.* v. *Commissioner*, 364 F. 2d 101 (C.A. 5, 1966), affirming on this point a Memorandum Opinion of this Court.

Since Kahr neither signed nor filed the 1959 return, the issue is whether the return filed can be considered fraudulent because of the action Kahr took to hide the existence of income before his death.

We have found no cases which directly discuss this exact point,[3] but the cases decided in the area support our conclusion that the fraud penalty will not attach unless at the time of filing the person or persons responsible for filing the return have a fradulent intent to evade the tax.

In *Harry Gleis*, 24 T.C. 941 (1955), affd. 245 F. 2d 237 (C.A. 6, 1957), we stated the applicable condition necessary to find that a return filed was fraudulent:

Fraud implies bad faith, a deliberate and calculated intention on the part of the taxpayer *at the time the returns in question were filed* fraudulently to evade the tax due. *E. S. Iley*, 19 T.C. 631. Such an intention is never presumed. Rather, its presence must be demonstrated by clear and convincing evidence, as to which the burden is with the respondent. * * * [Emphasis supplied.]

Also cf. *In re Parr*, 205 F. Supp. 492 (S.D. Tex. 1962).

This definition excludes the possibility that a fraudulent state of mind prior to the filing of the return can be imputed to the return. The fraudulent intent must be present when the return is filed and the intent must be to file a fraudulent return. *John B. Arnold et al.*, 14 B.T.A. 954, 973–974 (1928).[4]

Nor can the penalty be determined on the basis that the decedent's intent is imputed to his executor when the return is made out. As was stated in *Carter* v. *Campbell*, 264 F. 2d 930, 935 (C.A. 5, 1959):

Fraud implies bad faith, intentional wrongdoing and a sinister motive. It is *never imputed or presumed* and the courts should not sustain findings of fraud upon circumstances which at most create only suspicion. [Emphasis supplied.]

In order for Kahr to have filed a fraudulent return, he would have had to have been living and responsible for the proper filing of the

---

[3] In *Estate of Halley Tarr*, a Memorandum Opinion of this Court, dated Nov. 28, 1952, the Commissioner did attempt to find fraud on the part of the decedent and impose the penalty even though the return in question was prepared by his executor, on the ground that the decedent knew that any person filing a return from his records would have been misled and filed a faulty return. However, the case was decided on other grounds, the Court never discussing this contention.

[4] The *Arnold* case was cited in a Memorandum Opinion of this Court, *Donald B. Semple*, dated Aug. 28, 1951, where we said:

"It is the return itself which is the basis for the imposition of the penalty [citing *Arnold*]. Subsequent conduct of the taxpayer, after making the return, even though reprehensible, will not justify the imposition of the penalty, unless the fraudulent intent is shown to have existed *when the return was made*. * * *" [Emphasis supplied.]

return, and to have filed it with knowledge of its falsity. Had he lived, he could have had a change of heart at the last moment.

The only persons who could possibly be guilty of fraud as to the 1959 return are James Dalton, the executor, and Mary Kahr. Respondent has neither charged nor sought to prove as against either of them any knowledge of the understatement of income or any fraudulent intent whatsoever. Consequently, we find no fraud as to 1959.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

———

SCOTT, *J.*, concurring: On the basis of the facts found in this case, I agree with the conclusion reached in the majority opinion that respondent's determination of an addition to tax for fraud for the taxable year 1959 should not be sustained.

However, I do not agree with the statement in the majority opinion that the issue for the year 1959 is "whether the return filed can be considered fraudulent" or with the conclusion that because there was no fraud on the part of the executor and Mary Kahr in filing a return omitting a portion of Kahr's 1959 income, it follows that there should be no addition to tax for fraud in that year.

Section 6653(b), I.R.C. 1954, provides that if any portion of an underpayment of tax is due to fraud there shall be added to the tax an amount equal to 50 percent of the underpayment. This section does not require as does section 6501(c)(1), I.R.C. 1954, providing for an exception to the period of limitation for assessment of tax in case of fraud, that the return be fraudulent but requires only that a portion of the underpayment be due to fraud.

In my opinion the issue here is not whether the return filed on behalf of Kahr by his executor was false and fraudulent but is whether any part of the underpayment resulting from a part of Kahr's 1959 income not being included in the income reported on the return was due to fraud. I would decide the case strictly on the basis that on the facts here shown respondent has failed to establish by clear and convincing evidence that any portion of the underpayment for the year 1959 was due to fraud. The fact that Kahr was retaining partnership receipts without entry of the amount of such receipts on the partnership's books with the result that on the partnership books his partnership income was understated, and to the extent of his partners' interest in the partnership he was embezzling partnership funds, is not in and of itself clear and convincing evidence of a fraudulent intent on Kahr's part to evade tax. In *Rohde* v. *United States*, 273 F. Supp. 190 (E.D. Wis. 1967), the court stated:

The government's right to assessment of civil fraud penalties under section 6653(b), 26 U.S.C.A., I.R.C. 1954,[1] depends on a showing of willfulness, that is,

actual and deliberate wrongdoing with the specific intent to evade a tax believed to be owing. * * * [Footnote omitted.]

Although the words "intent to evade tax" do not appear in section 6653(b) as they did in section 293(b), I.R.C. 1939, in my opinion in order to prove that a part of the underpayment is due to fraud as required by section 6653(b), it is necessary to show that a portion of the underpayment is the result of "willfulness" and "deliberate wrong-doing with specific intent to evade tax." Under some circumstances respondent might be able to make such a showing by clear and convincing evidence even though the taxpayer died before his return was filed and his executor or administrator, because of lack of complete knowledge of the facts, filed an erroneous but not a fraudulent return. If respondent were able to show by clear and convincing evidence that a portion of an underpayment of tax for a year prior to a taxpayer's death was due to a fraudulent intent to evade tax on the part of such taxpayer while he was living, the addition to tax for fraud for such year would be proper even though the return was filed after the taxpayer's death and there was no fraud on the part of the taxpayer's executor in filing the return.

TANNENWALD, J., agrees with this concurring opinion.

---

RAUM, J., dissenting: I cannot agree with the conclusion that the Commissioner erred in determining the 50-percent addition to tax for fraud with respect to 1959. Section 6653(b) calls for such addition where "any part of *any underpayment* * * * of tax required to be shown on a return *is due to fraud*." (Italics supplied.)

Plainly, the taxpayer William Kahr was deliberately pursuing a course of conduct which proximately resulted in the falsification of his books, which in turn was the proximate cause of the underpayment of the 1959 tax. That fraudulent course of conduct was merely a continuation of the identical course of conduct carried on in 1958. The majority has found fraud for 1958, but not for 1959, and has relied upon the circumstance that the widow and executor who signed the 1959 return were innocent of fraud. In so doing, I think the majority has misconceived the scope of the statute.

The governing provisions of sections 6653(b) require merely that the "underpayment" be "due to fraud." There is no requirement that those who sign the return be participants in the fraud. Kahr, as a taxpayer, was plainly guilty of fraud, and his fraud was the proximate cause of the underpayment, regardless of the possible innocence of those who relied upon the false records in preparing the return. In the circumstances, I can see no basis for departing from the plain words of the statute in this case. The contrary conclusion produces the bizarre result that where a taxpayer has followed a course of conduct

over a period of years until his death to cheat the Government of taxes, an addition for fraud will be approved for each such year except the last provided that he dies before the final return is filed and those who sign that return are unaware of the fraud. I cannot believe that Congress intended any such easy escape from the civil consequences of a taxpayer's fraud.

DRENNEN, TIETJENS, WITHEY, and HOYT, *JJ.*, agree with this dissent.