Philip R. Simms and Nettie E. Simms v. Commissioner.
Simms v. Commissioner
Docket No. 4684-66.
United States Tax Court
T.C. Memo 1968-298; 1968 Tax Ct. Memo LEXIS 1; 27 T.C.M. (CCH) 1570; T.C.M. (RIA) 68298; December 31, 1968, Filed J. B. Fsiher, Danawha Valley Bldg., Charleston, W. Va., for the petitioner. John J. Larkin, for the respondent. 1571 FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies in petitioners' income taxes plus additions to tax for the calendar years 1953, 1954, and 1955 in the following amounts: Year
Tax
Section 293(b) [1]
Section 291(a) [1]
Section 294(d) (1) (A) [1]
1953
$28,419.02
$14,341.11
$7,104.75
$2,628.77
1954
10,399.24
5,199.62 [2]
964.59
1955
20,254.80
10,127.40 [2]
*3 Concessions have been made by both parties. The issues remaining for decision are the extent to which petitioner Philip Simms understated or failed to report his taxable income, whether such actions were due to fraud, and whether he failed to file declarations of estimated tax without reasonable cause. As to petitioner Nettie E. Simms, whether she was a party to joint returns with Philip and her liabilities thereon, her liabilities in connection with her failure to file an income tax return for 1953, and her liabilities for failure to file declarations of estimated taxes for 1953 and 1954. Some of the facts have been stipulated and they are so found. Petitioners Philip R. Simms and Nettie E. Simms (hereinafter sometimes referred to as Philip and Nettie, respectively) are husband and wife, who at the time the petition in the instant case was filed, resided in Dunbar, West Virginia. Neither of them filed an income tax return for the calendar year 1953. Joint returns in their names for the calendar years 1954 and 1955 were filed with the district director of internal revenue at Parkersburg, West Virginia. During the years 1950 through 1955, Philip, a graduate of the University *4 of West Virginia law school, practiced law in Dunbar, West Virginia. In addition he served as Dunbar's City Solicitor and attorney for the Bridge Commission and the Sanitary Board. During the years 1953, 1954 and 1955, Philip received substantial amounts of taxable income which he did not report on his Federal income tax returns. On March 12, 1957, James Hunt, a revenue agent for the Internal Revenue Service, contacted Philip in regard to his 1954 and 1955 income tax returns. He asked Philip to produce the relevant records pertaining to 1954 and 1955, and received bank statements and canceled checks of the Kanawha Valley Bank in Charleston, West Virginia. He also received a summary sheet which simply duplicated the totals on Philip's 1954 return. When asked if he had any other bank accounts, Philip stated that he had none outside of Kanawha County. Agent Hunt proceeded to examine the 1955 bank statements from the Kanawha Valley Bank and in the course of his examination came across a sheet of paper approximately two square inches in size bearing the notation 1000 CI. He asked Philip if he had, or had had any bank accounts in Cincinnati, Ohio. Philip then admitted that there were *5 certain Cincinnati accounts and produced bank statements and canceled checks pertaining to the various accounts. There were in fact four bank accounts in Cincinnati, three reflected deposits of $10,000 each and the fourth reflected a deposit of $16,000. On inquiry by Hunt, Philip explained that the amounts represented a $46,000 payment to him from William J. Howard, Inc., of Chicago, Illinois, on behalf of himself and D. L. Salisbury who was then Mayor of Dunbar, West Virginia. Philip did not indicate that there had been any other amounts received from William J. Howard, Inc. Further investigation revealed that there had been two large amounts received by Philip and Salisbury from William J. Howard, Inc., for legal services rendered. In 1953 they received a check for $40,000, and in 1955 they received the above-mentioned check for $46,000. Upon the receipt of each check, Philip and Salisbury traveled together to Chicago and there registered at the Palmer House Hotel. During the 1953 visit, Philip cashed the $40,000 check and divided the cash evenly between Salisbury and himself. At that time Philip and Salisbury agreed not to report the amount on their respective income tax returns. *6 During the 1955 visit Philip negotiated the $46,000 1572 check for four cashier's checks in the amount of $10,000 each and one cashier's check for $6,000. These checks were then taken by Philip to Cincinnati, Ohio, where he opened the four bank accounts discovered by agent Hunt. The First National Bank of Cincinnati, the Provident Savings Bank & Trust Co., and the Central Trust & Co., each had one of the $10,000 cashier checks deposited with it. The two remaining checks totaling $16,000 were deposited in the Fifth Third Union Trust Co. All of the accounts were checking accounts. Philip paid Salisbury his one-half share of the $46,000 by issuing checks to Salisbury in the amounts of $8,000 on the Fifth Third Union Trust Co. and $5,000 each on the Central Trust & Co., the Provident Savings Bank & Trust Co., and the First National Bank of Cincinnati. The three $5,000 checks were never cashed by Salisbury, and Philip eventually paid him $15,000 in cash. As a result of his investigation, agent Hunt referred Philip's case to the intelligence division of the Internal Revenue Service for possible criminal prosecution. J. H. Hill, a special agent with the entelligence division was then *7 assigned to work with agent Hunt. Agents Hunt and Hill proceeded to conduct a further examination into Philip's records. During their investigation they contacted Philip on a number of occasions and requested, inter alia, his books and records for the years 1953, 1954 and 1955. Philip proceeded to produce canceled checks and bank statements pertaining to his checking account with the Kanawha Valley Bank for the years 1954 and 1955, canceled checks, deposit tickets, and bank statements for an account in the name of Simms and Simms with the Kanawha Valley Bank for the period February 2, 1954 through October 13, 1955; canceled checks, bank statements and check stubs for the four Cincinnati banks in which the receipts from William J. Howard, Inc., were deposited; and canceled checks and bank statements for an account of Mrs. Philip R. Simms with the Charleston National Bank for the period January 1, 1954 through December 31, 1955. In addition to the checking account records, Philip produced two books containing duplicate cash receipts issued in connection with fees he had received during a part of 1954 and forward to April 1958. These books indicated that less than ten receipts were *8 issued in each of the years 1954 and 1955. They also indicated that four receipts were issued in 1953, of which only three were for legal fees. In addition Philip produced a sheet of paper bearing pencil notations which duplicated the amounts shown on his 1954 income tax return, and he produced several purchase invoices representing various expenses incurred in 1954 and 1955, and copies of receipts executed by D. L. Salisbury evidencing payment of one-half of the William J. Howard, Inc., fees. With the exception of those described above, Philip made no records available for 1953 and, because none existed, was unable to produce a copy of his 1953 Federal income tax return. During the course of the investigation Philip stated that he maintained a "diary" of his safe deposit box, but refused to make the "diary" available for examination. Philip denied the agents permission to inventory the contents of the safe deposit box and further refused to reveal if there was any amount of cash in the box. Philip also stated that he had a "diary" covering the services which he and D. L. Salisbury rendered for William J. Howard, Inc. Though the revenue agents asked to see the diary, Philip denied *9 the request. Philip had worksheets which detailed the items of income and expenses from which he prepared the 1954 and 1955 returns in issue. The revenue agents were denied general access to these sheets, though at times Philip would allow the agents to look at a specific item if it were being discussed. Philip would fold his worksheet so that only the particular item under discussion could be seen. Philip stated that he had an office diary in which he made notations of appointments and which contained entries of his charges and collections of legal fees. This record was not made available for the agents' examination. The revenue agents never did see those records which Philip refused to make available to them. Without those records it was impossible for them to reconcile Philip's books andrecords with the income tax returns which he filed. The agents then attempted to determine Philip's income for the years 1953, 1954 and 1955 through independent means. Through examination of various bank records, court records, and contact with Philip's clients, 1573 along with information orally obtained from Philip, the agents were able to verify that Philip collected taxable legal *10 fees during the years in question in at least the following stipulated amounts: 1953
1954
1955
$31,448.42
$28,640.12
$29,640.00 For each of the years 1953, 1954 and 1955, many of the specific items of income making up the above amounts were not reflected on any of the records made available to the agents. In addition to those items which could be identified as legal fees, respondent's agents also found cash deposits for the years 1953, 1954 and 1955 of $13,700, $9,250 and $6,726.62, respectively, the sources of which were unidentified, as follows: 1953
1954
1955
Total Deposits
$31,987
$29,415.97
$22,830.08
Source Identified 18,287
20,165.97
16,103.46
Source Unidenti- fied
$13,700
$ 9,250.00
$ 6,726.62
While neither Philip nor Nettie filed a Federal income tax return for 1953, joint returns in the names of Philip R. and Nettie E. Simms were filed in 1954 and 1955. During this entire period Nettie had salary income from the Ten-Mile Oil and Gas Company in the amounts of $1,320 in 1953 and 1954, and $990 in 1955. Income tax in the amounts of $115.20 in 1953 and 1954, and $86.40 in 1955, was withheld from her wages. *11 The above amounts for 1954 and 1955 were reflected on the joint returns filed for those years. Prior to the filing of the 1954 and 1955 returns, it had been the practice of Philip and Nettie to file joint returns and, with the exception of 1953, they had been doing so for years. Nettie had some acquaintance with the income tax laws, having previously filled out or helped prepare income tax returns for her father as far back as 1913. She did not file a separate return in 1954 or 1955. As in previous years, she gave all the withholding statements she received to Philip, who included her income in the joint returns filed for 1954 and 1955 and claimed credit for the tax withheld. Nettie denies signing the 1954 and 1955 returns. We find, however, that these returns were the joint returns of Philip and Nettie. On the 1954 return, gross income from Philip's legal practice was shown as $12,688.90 (composed of two items labeled "Dunbar Bridge" $5,000 and "Legal" $7,688.90) on page one of the return. Over $8,000 is shown as office expense, rent, salaries, etc., and claimed as an itemized deduction. No separate Schedule C, showing profit or loss from a business or a profession, was filed. *12 On the 1955 return, a separate Schedule C was filed for Philip's legal practice. This schedule showed unitemized gross receipts of $25,860, and deductions of $14,492.60. On a separate Schedule C, a $3,001.49 loss was claimed for a business of "Growing Orchids." No declaration of estimated tax was filed by either petitioner for 1953 or 1954. In his joint statutory notice, respondent determined that both Nettie and Philip were liable for the deficiencies in income taxes and penalties as set forth herein. For the calendar year 1953, in the absence of a return, he determined taxable income as follows: Philip R. Simms and Nettie E. Simms * * * Taxable Year Ended December 31, 1953 Adjustments to Adjusted Gross Income
Adjusted gross income as dis- closed by return (none filed)
$0
Unallowable deductions and additional income:
(a) Salaries
$ 2,720.00
(b) Business income 58,480.35
61,200.35
Corrected adjusted gross income $61,200.35 Explanation of Adjustments (a) It is determined that you received salaries of $2,720.00 for the year 1953, none of which was reported by you. (b) It is determined that you had business income of $58,480.35 for the *13 year 1953, none of which was reported by you. The computation is as follows:
Receipts: Legal fees
$51,448.42
Unexplained cash deposits and payments 13,700.00
Total receipts
$65,148.42
Deductions: Salaries and wages
$2,952.50
Salaries and wages
$2,952.50
Federal Insurance Contri- butions Act tax
44.29
Rental
2,158.07
Attorney fees
500.00
Office supplies
383.21
Telephone
130.00
Auto expense 500.00
6,668.07
Net income
$58,480.35
With the exception of the legal fees, the above correctly represented petitioners' combined taxable income. The correct amount 1574 for legal fees is $31,448.42, rather than the $51,448.42 amount shown. For the year 1954, respondent adjusted petitioners' taxable income as follows: *10 Adjustments to Taxable Income
Taxable income as disclosed by re- turn
$ 1,880.39
Unallowable deductions and addi- tional income:
(a) Legal fees
$16,790.12
(b) Cash deposits
9,750.00
(c) Business expenses
3,961.85
(d) Itemized deductions
268.10
(e) Interest income 100.00
30,870.07
Corrected taxable income $32,750.46 Taxable Year Ended December 31, 1954 Explanation of Adjustments
*14 (a) It is determined that you failed to report legal fees of $16,790.12 which you received in the taxable year 1954 and are includible in your income for that year. (b) It is determined that you made cash bank deposits of $9,750.00 during the taxable year 1954 which deposits represent taxable income to you for that year. (c) It is determined that you are entitled to business expenses of $8,898.56 instead of $12,860.41 as claimed on your 1954 return. The adjustment is as follows: Per Return
Deter- mined
Adjust- ment
General office expenses
$ 1,524.82
$1,524.82
$0
Bad Debts
4,622.40
0
4,622.40
Personal health and accident insurance
191.00
0
191.00
Civitan dues
114.75
0
114.75
Rental
2,268.87
2,264.55
4.32
Travel
399.09
372.61
26.48
Telephone
339.48
318.74
20.74
Bar Association dues
20.00
12.50
7.50
Salaries and wages
3,380.00
3,401.48
(21.48)
Auto expenses, etc. (50%)
0
542.76
(542.76)
Auto depreciation 0
461.10
(461.10)
Totals
$12,860.41
$8,898.56
$3,961.85
(d) Since your itemized deductions, as adjusted, are less than $1,000.00, you are allowed the standard deduction of $1,000.00 under section 141 of the Internal Revenue Code *15 . (e) It is determined that you received interest income of $100.00 for the year 1954 which was not reported by you. With the exception of the $16,790.12 amount shown as legal fees, and the $9,750 amount shown as cash deposits, the above computation correctly reflects the understatement in petitioners' combined taxable income. The correct amount of unreported legal fees received in 1954 was $15,951.22 ($12,688.90 reported from $28,640.12 discovered), and the amount of cash deposits is now stipulated to be $9,250. For the calendar year 1955, respondent adjusted petitioners' taxable income as follows: *10 Taxable Year Ended December 31, 1955 *10 Adjustments to Taxable Income
Taxable income as disclosed by re- turn
$10,592.06
Unallowable deductions and addi- tional income:
(a) Legal fees
$26,830.00
(b) Cash deposits
6,726.62
(c) Business expenses
5,434.33
(d) Loss on orchid greenhouse
3,001.49
(e) Rental expense
167.08
(f) Itemized deductions 1,071.26
$43,230.78
Corrected taxable income $53,822.84 Taxable Year Ended December 31, 1955 Explanation of Adjustments (a) It is determined that you failed to report legal fees of $26,830.00 *16 which you received in the taxable year 1955 and are includible in your income for that year. (b) It is determined that you made cash bank deposits of $6,726.62 during the taxable year 1955 which deposits represent taxable income to you for that year. (c) It is determined that you are entitled to business expenses of $9,058.27 instead of $14,492.60 as claimed on your 1955 return. The adjustment is as follows: 1575 Per Return
Deter- mined
Adjustment
Auto expense
$ 1,401.76
$ 871.24
$ 530.52
Business losses
3,390.40
0
3,390.40
Bad debts
314.15
0
314.15
Books
87.50
43.50
44.00
Salaries and wages
4,175.62
3,758.52
417.10
Rent
2,353.57
2,547.45
(193.88)
Telephone
579.72
579.72
0
General office supplies and expense
1,560.41
523.22
1,037.19
Travel
286.01
391.16
(105.15)
Attorney fees
325.00
325.00
0
Taxes 18.46
18.46
0
Totals
$14,492.60
$9,058.27
$5,434.33
(d) It is determined that the claimed loss for growing orchids is not deductible and that the expenses claimed were overstated and represent a personal, nondeductible expenditure. (e) It is determined that you are entitled to rental expenses of $615.51 *17 instead of $782.59 as claimed on your return. The adjustment is as follows: Per Return
Deter- mined
Adjust- ment
Depreciation
$233.93
$104.64
$129.29
Coal rental paid
391.26
341.26
50.00
Depreciation coal lease
20.00
20.00
0
Repairs
50.69
34.44
16.25
Taxes
34.00
34.00
0
Insurance 52.71
81.17
(28.46)
Totals
$782.59
$615.51
$167.08
(f) Since your itemized deductions, as adjusted, are less than $1,000.00, you are allowed the standard deduction of $1,000.00 under section 141 of the Internal Revenue Code. With the exception of the $26,830 amount shown as legal fees and the $3,001.49 amount shown as loss on orchid greenhouse, the above computation correctly reflects the combined understatement in petitioners' taxable income. The correct amount of unreported legal fees is $3,780 ($25,860 reported from $29,640 discovered) and the correct allowable loss on orchid greenhouse is now conceded by respondent to be $1,500.74. A portion of the understatement for each of the years in issue was due to Philip's fraud. Petitioners in the instant case, Philip and Nettie Simms, failed to file an income tax return for *18 the calendar year 1953. For the calendar years 1954 and 1955, joint returns were filed in their names. Respondent has determined deficiencies for all three years, and has determined that petitioners are liable for the fraud penalty for all three years under section 293(b) of the 1939 Code and section 6653(b) of the 1954 Code, the penalty for failure to file a return for 1953 under section 291(a) of the 1939 Code, and the penalty for failure to file an estimated income tax return for 1953 and 1954 under section 294(d) (1) (A) of the 1939 Code. Though respondent has the burden of proof to sustain his determinations of the fraud penalty, petitioners retain the burden of proof as to the remaining determinations. Estate of William Kahr, 48 T.C. 929 (1967), on appeal (C.A. 2 and C.A. 5, July 3, 1968); Henry S. Kerbaugh, 29 B.T.A. 1014 (1934), affd. 74 F. 2d 749 (C.A. 1, 1935). Respondent has conceded, and we have found, in the absence of any contrary proof, that one-half of the claimed orchid-growing loss claimed in 1955 is deductible. Also, the parties have stipulated and we have found that the correct amount of unidentified cash deposits for *19 1954 was $9,250 rather than the $9,750 amount determined as income by respondent in his statutory notice. In addition we have found that the statutory notice overstated the amount of unreported legal fees in each year in issue. The testimony of respondent's agents established that this item, in each year, represented those amounts which the agents were able to specifically verify as being paid to Philip by named individuals or corporations. Respondent concedes that the agents were only able to determine the source and amounts of legal fees in the amounts of $31,448.42, $28,640.12, and $29,640 for the years 1953, 1954 and 1955. Petitioners have agreed to these amounts and we have found that these amounts less the fees reported on the returns represent the correct amounts of unreported legal fees in the sums of $31,448.42 for 1953, $15,951.22 for 1954, and $3,780 for 1955. 1576 Petitioners contend that because respondent's determinations of the unreported legal fees were erroneous, the burden of proof as to the rest of the items in the statutory notice shifted to respondent. For this proposition they cite the Fourth Circuit's opinion in Welch v. Commissioner, 297 F. 2d 309 *20 (C.A. 4, 1961), reversing a Memorandum Opinion of this Court, where the Court held that when respondent's determination of taxpayer's income was clearly at variance with net worth schedules he had prepared, the burden of proof as to the inconsistencies shifted to respondent. That case, however, does not support the proposition that if respondent's determination is erroneous on some items, the burden of proof shifts to respondent on all items included within the scope of the deficiency notice. As the Fourth Circuit stated in Foster v. Commissioner, 391 F. 2d 727 (C.A. 4, 1968) at 735, affirming on this issue Grant Foster, T.C. Memo. 1956-246: It has long been held that if there is more than one item of unreported income in the deficiency determination, the taxpayers burden of proof must be met with respect to each item before the presumption is destroyed for that item. The introduction of evidence from which it could be found that some items were erroneously included in the deficiency notices does not overcome the Commissioner's presumption of correctness with respect to other, separable items. * * * With the exceptions of the indicated adjustment made *21 to the determined unreported legal fees, orchid-growing expenses and unidentified cash deposits, petitioners have utterly failed to meet their burden of proof on the items included within the statutory notice. Petitioners argue that the unidentified deposits could be duplications of amounts included in the unreported legal fees, and respondent's agents admitted that this was possible. We agree that there is the possibility of such a duplication. But where the petitioners' books and records are wholly inadequate to determine taxable income respondent's reference to unidentifiable bank deposits as income is a perfectly reasonable procedure and it is authorized under section 446 (b) of the 1954 Code. [3]
*22 As we stated in Thomas B. Jones, 29 T.C. 601, 613-614 (1957): Where, as here, a taxpayer has made numerous and comparatively large deposits in a bank account, the sources and nature of which are not recorded or accounted for in any books of account, the Commissioner's determination of income and of deficiencies in tax thereon by reference to such deposits has been approved in numerous cases. It is, of course, true that the existence of bank deposits, although not explained or accounted for in a satisfactory manner, does not of itself show that the sums deposited were or were not income. But where the Commissioner has determined that they were, the taxpayer has the burden of showing that the determination was wrong. Goe v. Commissioner, 198 F. 2d 851, certiorari denied 344 U.S. 897; Halle v. Commissioner, 175 F. 2d 500; Hague Estate v. Commissioner, 132 F. 2d 775, certiorari denied 318 U.S. 787, affirming 45 B.T.A. 104; Hoefle v. Commissioner, 114 F. 2d 713; Mauch v. Commissioner, 113 F. 2d 555; Herman J. Romer, supra; and Joseph L. Calafato, 42 B.T.A. 881, *23 affirmed per curiam 124 F. 2d 187. In the instant case, respondent's agents made a conscientious effort to identify the source of as many of Philip's deposits as possible. If they failed to wholly eliminate duplicate items, the fult and the liability lies not with them, but with petitioners who must bear the consequences of failing to keep adequate records and fully cooperating with respondent's agents. See Albert Gemma, 46 T.C. 821, 833 (1966). Respondent determined that for the years in issue Philip and Nettie are both liable for the fraud penalty under sections 6653(b) of the 1954 Code and 293(b) of the 1939 Code. The burden of proof on this issue is on respondent to show by clear and convincing evidence that the taxpayer knowingly understated a part of his income with an intent to evade the tax. Estate of William 1577 Kahr, supra; Gromacki v. Commissioner, 361 F. 2d 727 (C.A. 7, 1966), affirming a Memorandum Opinion of this Court; Henry S. Kerbaugh, supra; M. Rea Gano, 19 B.T.A. 518 (1930). Insofar as Philip is concerned, we find that respondent has met his burden. The parties have stipulated *24 that Philip received substantial amounts of income from his law practice well in excess of any income reported from that source. Also, Philip's books and records, which were made available to respondent's agents, failed to reflect much of the unreported income. These two circumstances alone are sufficient to sustain a finding of fraud on Philip's part. Holland v. United States, 348 U.S. 121 (1954). In addition there are other badges of fraud which indicate a fraudulent intent on Philip's part. Philip is an intelligent individual, having practiced law for a number of years, and having previously made out his own income tax returns prior to the years in issue. He undoubtedly was aware of the necessity of filing an income tax return and of the necessity of including all income for legal services. Yet he failed to file any return for 1953. We have concluded, and find from the entire record, that such failure was calculated and was with fraudulent intent. A further badge of fraud is that the 1954 and 1955 returns grossly understated his income. See Madeline V. Smith, 32 T.C. 985 (1959); J. K Vise, 31 T.C. 220 (1958), affd. 278 F. 2d 642 *25 (C.A. 6, 1960); Estate of William Kahr, supra. When he was asked about bank accounts outside of Kanawha County, Philip denied having any, when in fact he had substantial accounts in Cincinnati. See Madeline V. Smith, supra; and Lawrence Sunbrock, 48 T.C. 55 (1967). In addition he refused to disclose certain "diaries" to respondent's agents, which books contained relevant information as to his fees from various clients. Granat's Estate v. Commissioner, 298 F. 2d 397 (C.A. 2, 1962), affirming a Memorandum Opinion of this Court. Determination of fraud is a question of fact. Estate of William Kahr, supra; Mensik v. Commissioner, 328 F. 2d 147 (C.A. 7, 1964), affirming 37 T.C. 703 (1962). In light of all the evidence we find and hold that respondent properly determined that the fraud penalty was applicable to the deficiencies in Philip's income taxes for all of the years in issue. Petitioners contend that because no return was filed for 1953, there can be no fraud penalty for that year. This contention has no merit. It is well settled that where a taxpayer such as Philip knowingly does not *26 file a Federal income tax return with the intent to evade tax, the fraud penalty will apply in the same manner as if he had filed a fraudulent return. Roy Dixon, 28 T.C. 338 (1957); Fred N. Acker, 26 T.C. 107 (1956); Albert Gemma, supra; Veino v. Fahs, 257 F. 2d 364 (C.A. 5, 1958). Because Philip failed to file a return for the calendar year 1953, and filed fraudulent returns for the years 1954 and 1955, the statute of limitations does not prevent respondent from assessing Philip for deficiencies in income taxes for those years. [4] Our findings that he failed to file a return for the calendar year 1953, and failed to file any estimates for 1953 and 1954, together with the absence of any record proof that such failures were due to reasonable cause and not the result of wilful neglect, similarly renders him liable for the penalties provided under sections 291(a) and 294 (d) (1) (A) of the 1939 Code. *27 Respondent's determinations for each year in issue were joint, and did not differentiate between the respective liabilities of Nettie and Philip. This was incorrect, as Nettie's liability is not the same as that of Philip. 1578 Though Nettie had income of her own in 1953, she did not file separately, or join in any income tax return with Philip for that year. In such a circumstance, she cannot be held liable for any deficiencies in tax or additions thereto, attributable to Philip's failure to report income. Cirillo v. Commissioner, 314 F. 2d 478, 485 (C.A. 3, 1963), affirming on this point a Memorandum Opinion of this Court; Albert Gemma, supra at 835. Since no evidence was introduced tending to show a fraudulent intent on her part, the fraud penalty is not sustained as to her. The evidence presented was that Nettie's income for 1953 was derived solely from her salary from the Ten-Mile Oil and Gas Company in the amount of $1,320, of which $115.20 was withheld. She has not shown that her failure to file a return for 1953 was due to reasonable cause, but any liability which she may have for failure to file a return can only be based on her earnings. *28 Similarly, though no estimated income tax returns were filed for the years 1953 and 1954 by either Nettie or Philip, Nettie is not liable for any failure of Philip to file a declaration of estimated income. Any liability which Nettie might have for failing to file such returns may only be based on her earnings, and since such earnings did not exceed $4,500 for either year, she was not required to file an estimate for either. [5]
Nettie testified that she did not sign the 1954 and 1955 joint income tax returns in her name and Philip's. Apparently Philip signed both of their names. She contends on brief that she was thus not a party to the returns and that this excuses her from any liability for tax or penalties for those years. We have found that joint returns were filed. As we pointed out in Irving S. Federbush, 34 T.C. 740, 757-758 (1960), *29 affirmed per curiam 325 F. 2d 1 (C.A. 2, 1963), it is now well settled that a wife need not physically sign a joint return in order to be a party thereto, so long as both spouses intended the return to be a joint return. In Federbush joint returns were filed for Irving and Sylvia Federbush for a series of years including 1944. Sylvia Federbush signed all of the returns, with the exception of the 1944 return, and claimed that she signed those returns under duress, pleading, inter alia, complete ignorance of the tax law or of income tax returns. We pointed out that the joint returns filed included deductions, if not income of Sylvia, and that this was one factor which showed an intent to file a joint return. This was especially significant where the combined tax of the spouses was lower through filing joint returns. The fact that there was no tax reason why Sylvia should not have joined in a joint return was a further indication of her intent to join during the years in issue. We thus rejected the idea of duress. We similarly found that even though Sylvia failed to sign the 1944 return, she was still a party to a joint return for that year. Applying the same criteria *30 to that return as to the others which she had signed, we found that there was no intention that the 1944 return should be different from the returns filed for other years. Any refusal of Sylvia to sign the return was related to matters wholly unrelated to the filing of the return. We thus found that Sylvia and Irving filed joint returns for the years in issue and, under section 51(b) [6] of the 1939 Code (similar to 6013(a) and (d) of the 1954 Code), held that their liability was joint and several for the joint tax due and the fraud penalty attaching thereto. The facts in the instant case are even more persuasive that Nettie intended to file joint returns with Philip. As we have pointed out, she was familiar with the income tax law and income tax returns. Her income and credits were included in the 1954 *31 and 1955 returns. There was no reason for her not to join in joint returns, as such returns clearly resulted in a lower tax. She had turned over her withholding statements to Philip at all times and had previously joined with him in filing joint returns and 1579 there is no hint of duress in the instant case. Nettie even admitted that for the years in question she turned over her withholding statements to Philip for the purpose of filing joint returns. We have thus found that Nettie filed joint returns with Philip for the calendar years 1954 and 1955. Consequently, for these years, we hold that she is liable for the deficiencies and the fraud penalty as redetermined. Cirillo v. Commissioner, supra; Louise M. Scudder, 48 T.C. 36 (1967), on appeal (C.A. 6, June 5, 1967). Decision will be entered under Rule 50. 1 Footnotes
1. Internal Revenue Code of 1939. ↩
2. Section 6653(b) of the Internal Revenue Code of 1954↩.
3. SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING. (a) General Rule. - Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. (b) Exceptions. - If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.↩
4. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, within 3 years after such tax became due, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. * * * (c) Exceptions. - (1) False Return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. * * * (3) No Return. - In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. Substantially the same provisions appear in sections 275 and 276 of the 1939 Code.↩
5. Section 58 of the Internal Revenue Code of 1939 provides in pertinent part: (a) Requirement of Declaration. - Every individual * * * shall, at the time prescribed in subsection (d), make a declaration of his estimated tax for the taxable year if - (1) his gross income from wages (as defined in section 1621) can reasonably be expected to exceed the sum of $4,500 * * *↩
6. SEC. 51 INDIVIDUAL RETURNS. * * * (b) Husband and Wife. - (1) In general. - A husband and wife may make a single return jointly. Such a return may be made even though one of the spouses has neither gross income nor deductions. If a joint return is made the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several.↩