Ernestine K. Alcorn (Formerly Ernestine K. Stryker) v. Commissioner
Alcorn v. Commissioner
Docket No. 2383-68.
United States Tax Court
T.C. Memo 1969-147; 1969 Tax Ct. Memo LEXIS 150; 28 T.C.M. (CCH) 751; T.C.M. (RIA) 69147; July 7, 1969. Filed Thomas B. Masterson and Charles J. Onofrio, 271 S. Downing, Denver, Colo., for the petitioner. Arthur B. Bleecher, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the years 1961, 1962, and 1963 in the amounts of $2,235.36, $2,477.18, and $80,912.85, respectively. The issue for decision is whether petitioner Ernestine K. Alcorn is liable for the tax, by reason of having filed *151 a joint income tax return with her former husband, on certain amounts allegedly embezzled by him during the years 1961 and 1963. Petitioner does not contest the disallowance by respondent of loss carrybacks which resulted in the deficiency for 1962 and an additional deficiency for 1963. Findings of Fact Some of the facts have been stipulated and are found accordingly. Ernestine K. Alcorn (formerly Ernestine K. Stryker and herein referred to as petitioner) was a resident of Englewood, Colorado, when she filed her petition in this proceeding. She filed joint Federal income tax returns for the years 1961, 1962 and 1963 with her former and now deceased husband, James V. Stryker (herein referred to as Stryker), with the district director of internal revenue at Denver, Colorado. Beginning in 1953 and throughout the years in issue, Stryker was employed by Well Completions, Inc., a company engaged in the oil well servicing business in various areas of the United States and Canada, as assistant secretary with duties as office manager and purchasing agent. He was given wide discretion in running the everyday operations of the company since two of its officers, John Gordon Jackson, president, *152 and Robert W. Sneed, vice president, traveled considerably, and its treasurer, H. C. Bretschneider, had an office away from the company's base of operations. Stryker had no authority to draw checks upon the account of Well Completions, Inc., with the Denver United States National Bank (herein referred to as the bank). The individual signature of one of the three officers was required to validate a company check. Stryker handled all billings to Well Completions, Inc., and most of the bank loans secured by it by presenting the invoices and checks or papers to one of the officers for his signature. These transactions numbered in the hundreds per month. During the latter portion of the time Stryker was employed by Well Completions, Inc., he was president and treasurer of Atlas Milling and Mining Company, a corporation, and operated certain other related companies. Well Completions, Inc., acquiesced in this outside activity so long as it did not interfere with Stryker's duties with it and entered into an arm's-length agreement with him for the rental of certain of its equipment to be used by Atlas Milling and Mining Company. John Gordon Jackson, president of Well Completions, Inc., *153 paid $1,500 to Stryker for the purchase of a mining claim, and when Stryker was unable to secure the claim he gave Jackson certain Atlas Milling and Mining Company stock of that value. In June 1964, Jackson began to receive complaints on trade accounts that should have been paid, and he noticed that there was less cash on hand than projected. Upon checking with the bank, he discovered that certain notes had been handled improperly and that in some instances the same collateral was used for two notes. An officer of the bank contacted Arthur Andersen & Co., a partnership of certified public accountants, and, after consultation, 752 Jackson authorized a complete audit of the books of Well Completions, Inc.
On June 16, 1964, a meeting was held at the office of Well Completions, Inc., to confront Stryker with the discoveries and to determine for purposes of the audit a pattern, if any, to unauthorized withdrawals. Present were Stryker, Jackson, Sneed, and Carl H. Schumann of Arthur Andersen & Co. At the meeting Stryker admitted that without the knowledge of anyone at Well Completions, Inc., or at the bank, he had appropriated money of Well Completions, Inc., for use in the mining *154 and milling operations of his controlled corporations. His modus operandi was to purchase from the bank with checks endorsed in blank by the officers of Well Completions, Inc., cashiers' checks made payable to Atlas Milling and Mining Company or its related companies or to other concerns or individuals for fictitious purchases. Stryker expressed his willingness to cooperate and to make restitution. Shortly after the meeting, Stryker turned over mineral leases and shares of stock in his company which were in his name to the attorney for Well Completions, Inc. On June 26, 1964, Stryker's body was found in a well on the property of his personal residence. A coroner's report listed the cause of death as drowning (suicide). Arthur Andersen & Co. Determined in a final audit that there were total unauthorized disbursements of Well Completions, Inc., funds of $238,671.59, including a total of $7,675.27 in 1961 and $126,800.16 in 1963. Negligible recoveries were made by Well Completions, Inc., from the assets turned over by Stryker in 1964. It did receive $25,000 from the Aetna Insurance Company, which had bonded Stryker for that amount. Well Completions, Inc., presently has a lawsuit *155 pending against the Denver United States National Bank seeking damages of $165,000 for improper disbursements of its funds to Stryker. No amount of the unauthorized disbursements was reported as income in the joint Federal income tax returns filed by petitioner and Stryker for 1961 and 1963. Petitioner had no knowledge that Stryker had wrongfully diverted funds from Well Completions, Inc. But she voluntarily signed the joint income tax returns and believed that they accurately recorded all income earned. Opinion Petitioner argues principally that respondent failed to prove the receipt during 1961 or 1963 by herself or Stryker of income in excess of that reported on their joint income tax returns. A second, but related, argument is that no embezzlement occurred since Stryker had an express or implied obligation to repay all funds taken. Alternatively, petitioner argues that any amount embezzled by Stryker was properly chargeable as income to the corporations controlled by him which received the beneficial enjoyment of the funds. Respondent contends that Stryker embezzled and did not report as income the amounts of $7,675.27 and $126,800.16 in the years 1961 and 1963, respectively, *156 the tax upon which petitioner is jointly and severally liable for under section 6013, Internal Revenue Code of 1954. [1] No additions to the tax have been imposed by respondent. Petitioner voluntarily signed the joint returns made with Stryker and is severally liable for the tax on the aggregate income of the two. Section 6013(d)(3). The deficiencies determined by respondent are presumptively correct; the burden is upon petitioner to prove that the amounts determined by respondent to have been embezzled by Stryker were not includable in his "gross income." Rule 32, Tax Court Rules of Practice; Jackson v. Commissioner, 380 F. 2d 661 (C.A. 6, 1967), certiorari denied 389 U.S. 1015 (1967), affirming a Memorandum Opinion of this Court; Bishoff v. Commissioner, 27 F. 2d 91 (C.A. 3, 1928), affirming 6 B.T.A. 570 (1927). We hold that petitioner has failed to satisfy that burden. Petitioner offered no evidence whatsoever that Stryker did not appropriate funds of Well Completions, Inc., for use by his controlled *157 corporations, but only objected to certain evidence proffered by resondent in support of his determinations. [2] This record falls far short of establishing that Stryker was under an implicit obligation to repay 753 the appropriated funds. Jackson and Well Completions, Inc., were well aware of Strykker's outside activities but, for all that appears in this record, knew nothing of Stryker's misappropriations. All dealings between Well Completions, Inc., and Stryker with regard to his controlled corporations were at arm's-length. Jackson was no more than a passive holder of a few shares of Atlas Milling and Mining Company stock. As a result, we conclude that Stryker embezzled funds during 1961 and 1963 in the amounts determined by respondent. See Colo. Rev. Stat., Sec. 40-5-16 (1963); Gill v. People, 139 Colo. 401, 339 P. 2d 1000 (1959). Misappropriated funds are includable in the *158 "gross income" of the embezzler. James v. United States, 366 U.S. 213 (1961). And it matters not that the funds are used for purposes other than the embezzler's personal needs, so long as he has actual command and dominion over them. Barbara M. Bailey, 52 T.C. No. 11 (April 21, 1969). Although Atlas Milling and Mining Company and its related companies actually expended the embezzled funds, Stryker was "the force and the fulcrum which made those benefits possible." Geiger's Estate v. Commissioner, 352 F. 2d 221 (C.A. 8, 1965), affirming a Memorandum Opinion of this Court. Consequently, the funds constituted income to Stryker. Corliss v. Bowers, 281 U.S. 376 (1930). No restitution was made by him during 1961 or 1963 to be set off against such income. We are constrained to hold under these circumstances that petitioner is jointly and severally liable under section 6013 (d)(3) on the ground that she filed legally effective joint returns for the years in issue. While we sympathize with petitioner's plight and we recognize the harshness of this result, the inflexible statute leaves no room for relief. As we view it, only remedial legislation *159 can soften the impact of the rule of strict individual liability for income taxes on many married women who are not fully aware of the consequences of the provisions relating to the filing of joint returns. To be sure, this is indeed an extreme case which illustrates the degree of risk assumed by filing joint returns. It seems very severe that petitioner should be liable for a tax based on money embezzled by her former husband without her knowledge. However, under the language of the statute, petitioner stands in the shoes of her husband and is therefore individually responsible for any tax deficiency legally owed by her former husband. No other interpretation of the statute is rationally permissible if the phrase "liability with respect to the tax shall be joint and several" is to be given its usual and long-accepted meaning in the law. Accordingly, Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. Stryker's statements at the meeting called by Jackson constituted declarations against his pecuniary interests and were admitted through the testimony of Jackson who was present at the meeting and was a witness to the statements. 2 Jones on Evidence, Secs. 295, 315 (5th ed. 1958).↩