JAY J. ARMES and ROSE B. ARMES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Armes v. Commissioner
Docket No. 5901-66.
United States Tax Court
T.C. Memo 1973-88; 1973 Tax Ct. Memo LEXIS 196; 32 T.C.M. (CCH) 385; T.C.M. (RIA) 73088; April 17, 1973, Filed Towner Leeper, for the petitioners. Ralph V. Bradbury, Jr., for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: This case is before the Court on an order of remand by the Court of Appeals for the Fifth Circuit pursuant to its opinion in Armes v. Commissioner, 448 F. 2d 972 (1971). In that opinion, the Court of Appeals affirmed our decision (opinion released as T.C. Memo. 1969-181) as to the amount of petitioners' deficiency in income tax for 1962, computed by use of the bank-deposits-and-cash-expenditures method. However, the Court of Appeals remanded the case for more specific findings and conclusions of law for 1960 and 1961 as to "each taxable source [of income] *198 2 alleged by the Commissioner, and each source put forward by the taxpayer as a nontaxable source," 448 F. 2d at 976, and for consideration of certain other points. Pursuant to the mandate, additional testimony was heard, and certain additional exhibits were introduced in evidence. Rather than enter supplemental findings, we have recast and here set forth all our findings applicable to 1960 and 1961, based on the evidence offered at the original trial as well as the trial on remand. These findings refer to 1962 and later years, and to years prior to 1960, only where the facts as to those years have a bearing on the issues presented for 1960 and 1961. Hereinafter, "Jay" and "petitioner" will refer to Jay J. Armes, "Rose" will apply to petitioner Rose B. Armes, and "petitioners" will designate Jay J. Armes and Rose B. Armes jointly. FINDINGS OF FACT Issue 1. - Sources of Taxable Income. In 1955 or 1956, petitioner entered into business as a licensed private investigator, using the name Central Bureau of investigation. His office was located in the Caples Building in El Paso. After about two years of operation, this business failed because petitioner *199 "did not have a proper supervision" of his expenses. 3 On February 25, 1960, petitioner obtained another license as a private investigator and opened a business known as The Investigators, to which he devoted his full time. Initially, as a means of controlling expenses, he operated the business from his home, arranging for telephone coverage through an answering service, and maintained a mobile telephone in his automobile. By early fall of 1960, petitioner had opened and begun furnishing a rented office at 2225A Montana in El Paso, Texas. He operated his business from this location during the remainder of the period in controversy. In addition, he employed a secretary and, as needed, hired individuals - usually policemen - who worked part-time for him. In his private investigation business, petitioner conducted domestic, industrial, and criminal investigations, including the collection of evidence for court proceedings. The domestic investigations involved the gathering of evidence, through surveillance or otherwise, for a husband or wife having martial difficulties or involved in divorce or separation proceedings. His business or industrial work involved the sale *200 and installation of equipment for clients, as well as the investigation of thefts, embezzlements, sabotage, and accidents. The criminal phase of the work required the collection of evidence for use in criminal cases; many of 4 these investigations were initiated by parents whose children were alleged to have engaged in wrongdoing. Also, in the beginning, a great deal of petitioner's work consisted of the collection of bad checks. Petitioner began building his business in early 1960 by sending letters to lawyers and businessmen to introduce his investigative and check-collection services. He also spent a considerable amount of time getting acquainted with members of the police force, hoping they would recommend him for investigative work. After he opened his office, he arranged for an advertisement in the yellow pages as soon as a new telephone directory was published - in either late 1960 or early 1961. In the latter part of 1961, he cut a tape and ran a radio advertisement on his business. Although petitioner's minimum fee for domestic investigations at the outset was only $25, the amounts he charged in individual cases differed and depended on what the circumstances *201 justified. In one case handled shortly after the business was opened, his fee was $300; for recovering some jewelry in 1961, he charged $350. For his check-collection services, he charged a percentage of the recoveries. As an integral part of some of the business or industrial investigations, he bought, sold, and installed electronic and other equipment. 5 In June 1961, the Desert Hills Motor Hotel gave petitioner two checks totaling $3,266.30 (one for $1,200 dated June 8, 1961, and the other for $2,066.30 dated June 28, 1961). At the suggestion of Edmund L. Given, owner of the Desert Hills Motor Hotel, these check were made payable to him and were then endorsed by him and delivered to petitioner. The transaction was handled in this manner to prevent disclosure to Given's office help of petitioner's investigation. The two checks were then deposited by petitioner in The Investigators' checking account at the First State Bank "Five Points" in El Paso. Desert Hills Motor Hotel gave petitioner two other checks - one for $476.05 dated September 1, 1961, and the other for $25 dated September 27, 1961. These four Desert Hills Motor Hotel checks totaling $3,767.35 represented *202 compensation for an investigation of the motel personnel - the whole staff, including the bookkeeping department - and for the installation and servicing of certain equipment (including a tape recorder, two amplifiers, and some wiring). Petitioner purchased the equipment for the purpose of making the installation. Although the first two Desert Hills Motor Hotel checks totaling $3,266.30 were deposited in the checking account of The Investigators at the First State Bank, neither check was recorded as gross income or receipts in the records used for 6 the preparation of petitioners' income tax return for 1961; in fact, the total receipts recorded in petitioner's daily summary sheets were only $346 for June and $417.80 for July 1961 and totaled on $2,071 - including the $346 for June - for the first six months of that year. The amounts of these two check were not reported in the income tax return filed by petitioners for 1961. Petitioner had no bank account at the beginning of 1960. On March 21, 1960, he opened a checking account at The State National Bank of El Paso. Between that date and August 9, 1960, he made numerous deposits totaling $6,247 in this account. Respondent *203 has determined that of these deposits, $154 was derived from nontaxable sources. Between August 26, 1960, and March 31, 1961, petitioner did not maintain a bank account. During this period, however, he rented the office at 2225A Montana and bought furniture for it. In March 1961, petitioner opened a checking account at the First State Bank "Five Points" in El Paso in the name of The Investigators. In this account, he made numerous deposits totaling $27,833.22 during 1961. In addition, in a savings account in his own name at the same bank, he made deposits totaling $2,087 during that year, and in an account in the name of P. D. Armas (petitioner's father), deposits 7 totaling $1,206 were made. In determining that petitioner's 1961 deposits of business receipts in these three accounts totaled $31,143.75, respondent improperly included the 1961 deposits and interest ($17.53) reflected in the savings account in Jay's father's name. Respondent adjusted the $31,143.75 figure by subtracting the following nonbusiness receipts which he identified as indicated: Refund from Roger Shoe Store
$118.35
Deposit from P. D. Armas
50.00
Deposit from P. D. Armas
25.00
Deposit from P. D. Armas
25.00
Check from Jack Niland for recovery on automobile accident
613.60
Proceeds of sale of automobile to Nance Buick
2,850.00
P. D. Armas' social security checks deposited in savings account in his own name
[1] 306.00
[1] $3,987.95
*204 The deposit slips for 1960 and 1961 reflect that many of petitioner's deposits in these accounts were currency. Petitioner obtained currency in several ways. From time to time, he cashed business checks without depositing them and 8 used some of the money to support himself and his family and to pay expenses of his business. On occasion, he also went to the bank with clients who cashed checks and paid all or part of the proceeds to petitioner as fees for services. Petitioners filed an income tax return for 1960 showing total receipts in the amount of $531.75; Schedule C headed "Profit (or Loss) From Business or Profession," attached to the return, shows petitioner's principal business activity as "Private Investigation" and his business name and location as "The Investigators, 2225A Montana, El Paso, Texas." Petitioners filed an income tax return for 1961 showing total receipts in the amount of $4,651.95; Schedule C attached to *205 this return shows that petitioner was engaged in the same principal business activity, i.e., The Investigators. These amounts of $531.75 and $4,651.95, respectively, were the only gross income listed in petitioners' 1960 and 1961 returns. Petitioners' income tax return for 1960 shows that on October 11, 1960, petitioner purchased capital items, primarily office furniture and equipment, in the total amount of $1,981 including $650 for two desks. The return also shows that he acquired a Cadillac automobile for $4,500 on that date. However, the automobile was actually purchased in December 1959, and payments were made on the purchase price 9 throughout the year 1960. [1] Petitioners' income tax return for 1960 also shows that Jay incurred business expenses in the total amount of $2,137.03. [2]
*206 Petitioner's income tax return for 1961 shows that Jay acquired a 1961 Thunderbird convertible in July 1961 for $5,765 and deducted straight-line depreciation thereon at the rate of $160 per month for a total of $960. The return also shows that he acquired a 1961 Cadillac convertible in September 1961 for $7,800 and deducted straight-line depreciation (using a cost basis of $4,800) at the rate of $133.33 per month for a total of $533.32. In addition, he deducted depreciation of $1,500 on the 1959 Cadillac convertible, shown in this return to have been acquired in December 1959 rather 10 than in October 1960 as reflected in the 1960 return. The business expenses deducted in petitioners' 1961 return totaled $16,666.12. [3] Among these expenses were $3,017.83 for telephone, $1,058 for advertising, $1,033.60 for equipment rental, $156.17 for equipment maintenance, and $908.03 for gas and oil. Petitioner maintained *207 no journals or ledgers reflecting the income and expenses of his business during 1960. He retained no canceled checks, and the bank statements, check stubs, and the invoices and receipts which he made available to the internal revenue agent when his 1960 return was examined were incomplete. For 1961, petitioner made available to the revenue agent cash summary sheets - reflecting certain receipts and expenditures - maintained by a secretary, and a ledger - containing data taken from the cash summary sheets - kept up to date once a month by a bookkeeper. All the cash summary sheets for the year were not available. Invoices and receipts in support of expenditures were incomplete, as were bank statements, canceled checks, and check stub books. 11 In 1960, petitioner told a friend that his earnings exceeded $15,000 a year. On September 21, 1961, petitioner bought an automobile through the Lone Star Mortgage Company, and a commission salesman for that company filled out, and petitioner signed, a "Customer's Statement." This statement shows petitioner's income to be $20,000. When a customer stated that his income was within a given range, e.g., $15,000 to $20,000, this salesman *208 followed a practice of entering the larger of the two figures on this type of statement. Petitioner's signature appears following the statement: "Undersigned Warrants the Truth and Accuracy of Foregoing Information." Issue 2. - Alleged Nontaxable Sources of Funds. During the course of his investigation of this case, the revenue agent had three separate interviews with petitioner. During one interview - in January 1964 - petitioner was asked whether he had any sources of nontaxable funds in 1960 and 1961. Petitioner answered that he had received some money from his father and mother but did not know how much. Petitioner also stated he had some $2 bills and some rare silver dollars in a safety deposit box, the total of which "could've been about a thousand dollars" in January 1960 and that he had used some of this money in 1962. In addition, petitioner 12 told the revenue agent that in 1960, he had bout 2,700 silver dollars - received from his father - of which he deposited approximately 1,200 in 1962, and he still had about 1,500 left. Further, he stated that he had received about $5,000 from his father-in-law from the sale of his residence but used part of it to make *209 a downpayment on his own house. During the course of this conference, petitioner told the revenue agent that he received no inheritances or insurance proceeds on his father's death except for $500 in burial insurance. This payment was actually received in 1962. At this interview, petitioner did not mention any of the following as nontaxable sources of his 1960 and 1961 bank deposits: (1) The February 27, 1958, sale of a lot to the State of Texas for $1,000; (2) The July 22, 1959, sale of property to Charles Matthews for $1,200; (3) The August 6, 1959, sale of Matthews' equity in the residence for $1,000; and (4) Retirement checks and social security checks of his father-in-law. Petitioner asserted during the proceedings of this case that he received funds from three nontaxable sources: (a) real estate sales; (b) his father-in-law; and (c) his father. (a) Funds from real estate sales. Petitioners sold an unimproved lot to the State of Texas on February 27, 1958, for 13 $1,000. They sold a parcel of real property on July 22, 1959, to Charles and Janet B. Matthews for $1,200 or $1,500 in cash plus the Matthews' equity in a residence in Miller's Lakeside Addition. *210 On August 6, 1959, petitioners sold for $1,000 the interest they had acquired from the Matthews. (b) Funds from father-in-law. (1) Sales of father-in-law's property. Jose M. Ontiveros (hereinafter Ontiveros), father of petitioner Rose B. Armes, was hospitalized for an injury in late 1958. When Ontiveros was discharged from the hospital, he went to live with petitioners. On December 31, 1958, Ontiveros gave petitioner a general power of attorney to manage his affairs. On April 16, 1959, pursuant to the power of attorney, petitioner conveyed to the State of Texas, in consideration of $3,300, a residence located at 5106 Stevenson in El Paso, where Ontiveros and his minor daughter, Mary, had lived. (2) Father-in-law's pension money. During the period that Ontiveros resided with petitioners, he was receiving monthly retirement payments of $30 from the City of El Paso, $84 (or $93) per month from the Railroad Retirement Board, social security payments of $30 per month for the support of his daughter, Mary, and social security payments for himself in amounts not shown by the record. The maximum monthly social security payment in 1960 was $127. Sec. 215(b), 14 Social Security *211 Act, 42 U.S.C.A. 415 (a), applicable to 1960. On September 17, 1959, Ontiveros revoked the power of attorney which he had given petitioner, and at or about the same time, he moved from Jay's home. Thereafter, on November 5, 1959, he instituted a suit against petitioner alleging the latter's misappropriation of the $3,300 received from the State of Texas, as well as the Railroad Retirement Board and City of El Paso pension checks totaling approximately $900. The suit was dismissed after a preliminary hearing. (c) Funds from father. In 1946, petitioner was involved in an accident in which he suffered the loss of his hands. On December 6, 1948, Jay, by and through his father (Pedro D. Armas, hereinafter Armas) as next friend, instituted a suit against the Texas and New Orleans Railroad Company and The Texas and Pacific Railway Company, defendants, to recover damages of $103,500 resulting from the injury. The petition alleged that one of the defendants negligently left some railroad torpedoes on and hear its right of way, that these torpedoes were found by a young boy who later showed them to Jay, and that two of the torpedoes exploded in Jay's hands after *212 he picked them up and rubbed them together. The suit was dismissed without prejudice on June 2, 1949, and neither petitioner nor his father recovered anything on the damage claim. 15 About two weeks after Ontiveros moved from petitioners' residence in September 1959, Armas and Jay's mother moved into petitioners' home to live with them. Armas was then about 58 years of age. He was a meat cutter by trade, and his wages had been relatively low, e.g., $30 to 35 per week in 1948. He was the father of eight children (including three who died shortly after birth) and had lived in very modest housing. Petitioner's mother had never worked outside the home. Armas' daughter, Eva Boone, and her husband had lived with Armas during two different periods since their marriage in 1956 and had contributed to household expenses. Armas had drunk heavily for many years and had been unemployed from time to time, sometimes for periods of five or six months. On one occasion, he was out of work for almost a year. By representing himself to be indigent, he obtained free outpatient care at a local hospital on 72 different occasions between December 6, 1956, and October 20, 1961. Records of *213 six interviews of Armas by hospital officials, between December 29, 1959, and November 28, 1961, show that he represented that he was supported in whole or in part by one or more of his children. Armas died on December 26, 1961. His daughter, Beatrice Santo Domingo, received no inheritance from her father and never heard that petitioner had put any of their father's 16 money into his own bank account. Armas' daughter, Eva, inherited nothing from her father, and she never saw any boxes or chests of money in the house. Petitioner gave no money belonging to his father to any members of his family and told none of them that he received any of his father's money. When Armas died, some of his children gave Jay approximately $1,500 to pay for their father's burial expenses. In the private investigation business which petitioner entered in 1955 or 1956, he lost a sum of money which, according to his estimate, could have been "as much as five thousand dollars." There were bills which remained to be paid when he closed the business. Later, he and two or three of his friends on the police force opened a nightclub known as The Office Lounge. This business failed in 1959, and petitioner *214 lost an amount which, according to his estimate, approximated "two or three thousand dollars." Petitioner was unemployed for two years between 1955 and 1960. He did not file an income tax return for 1957, 1958, or 1959. A revenue agent made an investigation of his liability for those years and concluded that petitioner had no tax liability. 17 Petitioner purchased a residence at 477 Crestwood Place in El Paso in 1959 and used an amount approximating the money he received from the sale of Ontiveros' house to make the downpayment. Petitioner, his wife, their two children - Marlene and Deborah - and Ontiveros and his daughter, Mary, moved into the house. He also purchased a Cadillac convertible automobile in December 1959 on which he made a downpayment in an amount not disclosed by the record. On June 12, 1956, petitioners borrowed $268.80 from the El Paso National Bank. They made certain installment payments totaling $156.80 on the loan between June 27, 1956, and February 28, 1957, when the balance due was $112. On June 12, 1957, the bank charged off the amount remaining due on the note as uncollectible. On September 7, 1962, after discussing his credit rating with *215 an official of the bank, Jay paid the balance due on the loan. During 1960 and 1961, petitioner had no income from interest on Government obligations and received no income in the form of scholarships or fellowships. The only insurance recovery obtained in these years was the sum of $613.60 received from Jack Niland, an attorney, in connection with an automobile accident. This recovery was identified and treated by respondent as a nontaxable receipt. 18 Issue 3. - Amounts of Understatements of Gross Receipts. The following table sets forth the determinations made by respondent in the notice of deficiency: 1960
1961 Net deposits of business
receipts after adjustment
for nonbusiness receipts
$6,093.00
$27,155.80
Business, living, and capital
expenditures paid by cash
9,715.87
12,300.81
Total gross receipts
$15,808.87
$39,456.61
The parties have stipulated that an adjustment in the amount of $1,527.59 should be made to gross receipts for 1961. Also, in determining total cash expenditures for each year, respondent made no adjustments for checks written to "cash" and unidentified payees; to adjust for duplications, gross *216 receipts are to reduced by $2,002.35 in 1960 and $2,029.39 in 1961. As stated earlier in our Findings, in computing deposits petitioner made in 1961, respondent improperly included deposits in the amount of $1,206 which Jay's father made to his own savings account, as well as interest ($17.53) earned on that account. Respondent made an adjustment in the amounts of these deposits by reducing them by $306 which he classified as Jay's father's deposits of his social security checks. Therefore, the 1961 deposits should be further 19 reduced by $917.53. In addition, the following deposits which were included in petitioner's cash receipts for 1961 and not otherwise eliminated by respondent were derived from nontaxable transactions: Payor
Date
Amount Philip Angelotte
9/20/61/
$168.75
Hugh McNutten
4/12/61
101.00
George Leeper
4/24/61
126.50
Star Printing Company
10/16/61
55.00
Philip Angelotte
11/27/61
56.25
Total
$507.50 20 The amounts by which petitioner understated their gross receipts for 1960 and 1961 are computed as follows: 1960
1961 Total gross receipts (per notice of deficiency)
$15,808.87
$39,456.61
Less:
Stipulated adjustment
$-0-
$1,527.59
Checks to "cash" and unidentified payees
2,002.35
2,029.39
Deposits from nontaxable transactions
-0-
507.50
Armas' deposits (and interest) in his own savings account (minus $306 in social security checks deposited, previously adjusted)
-0-
917.53
Total adjustments
$2,002.35
$4,982.01
Actual total gross receipts
$13,806.52
$34,474.60
Less:
Total receipts reported on tax returns
$531.75
$4,651.95
Understatement of gross receipts
$13,274.77
$29,822.65
*217 21 OPINION 1. Statute of Limitations. Section 6501(a) [4] allows the Commissioner three years after a return is filed in which to assess any deficiency in income tax. An exception to that provision, section 6501(e) (1) (A), is in part as follows: (A) General rule. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph - (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; * * * In petitioners' income tax returns for 1960 and 1961, gross income was reported in the respective amounts of $531.75 and $4,651.95. *218 Therefore, to lift the three-year bar imposed by section 6501(a) on the assessment of deficiencies for these two years, the evidence must show that petitioners omitted 22 from their returns sums of gross income in excess of $132.94 (or had total gross income over $664.69) for 1960 and $1,162.99 (or had total gross income over $5,814.94) for 1961. And the burden of making this showing by a preponderance of the evidence rests with respondent. Wood v. Commissioner, 245 F. 2d 888, 893-895(C.A. 5, 1957); C.A. Reis, 1 T.C. 9, 12-13 (1942). To carry his burden that petitioners omitted from each return an amount of gross income in excess of 25 percent of the gross income stated in such 1960 and 1961 returns, respondent relies upon (1) the bank-deposits-and-cash-expenditures method to reconstruct petitioners' income for both years and, alternatively, (2) specific omissions of business income for 1961. Respondent contends that the "likely source" of this omitted income, Holland v. United States, 348 U.S. 121, 137-138 (1954), was petitioner's private investigation business, and the Court of Appeals has stated in the instant case that in order to *219 establish a "likely source" of the deposits, respondent has the burden of showing that such business was "capable of generating substantial receipts in excess of those reported." 448 F. 2d at 975 fn. 2. (a) Bank-deposits method, 1960 and 1961. The evidence is undisputed that during 1960, petitioner made numerous, regular, and frequent deposits totaling $6,247 in a checking 23 account at The State National Bank of El Paso. Of these deposits, respondent determined that $154 was derived from nontaxable sources, leaving net deposits in the amount of $6,093. The evidence is also undisputed that during 1961, petitioner made numerous, regular, and frequent deposits totaling $27,833.22 in a checking account maintained in the name of The Investigators at the First State Bank "Five Points" in El Paso and $2,087 in a savings account at the same bank in his own name. Respondent determined also that petitioner made deposits in a savings account maintained in his father's name at this bank, and erroneously included these deposits and interest thereon, totaling $1,223.53, in determining the amount of petitioner's 1961 deposits which were derived from business receipts. As *220 explained in our Findings, respondent adjusted his computation of petitioner's 1961 total deposits of $31,143.75 by determining that $3,987.95 did not represent business receipts, and we have found that additional deposits totaling $1,425.03 were derived from nontaxable sources. This leaves net deposits of $25,730.77 for 1961. The question is whether respondent's evidence is sufficient to support an inference that amounts in excess of $664.69 of the 1960 net deposits of $6,093 and $5,814.94 of the 1961 net deposits of $25,730.77 constitute gross income from petitioner's business within the provisions of section 6501(e) (1) (A), quoted in pertinent part above. 24 Where it is shown that a taxpayer is engaged in a lucrative business and is making regular and frequent bank deposits, a trial court may reasonably infer that such deposits represent income. In a leading case, Gleckman v. United States, 80 F. 2d 394 (C.A. 8, 1935), certiorari denied 297 U.S. 709 (1935), the court, in affirming a criminal conviction based on a bank-deposits analysis, stated (pp. 398-399): There was no direct testimony to show what business transacted by Mr. Gleckman had *221 produced the large sums of money that accrued to him in addition to the items reported in his return. There was no direct proof of any specific deals or transactions outside of those included in his return which were shown to have netted Mr. Gleckman any gains or profits. All of the testimony adduced for the defendant concerned the large items of receipts that accrued from nontaxable transactions, and none of the government's witnesses testified to any particular gain accruing to Mr. Gleckman from any specific transactions besides those reported by him. * * * * * * It may be conceded also that the bare fact, standing alone, that a man has deposited a sum of money in a bank would not prove that he owed income tax on the amount; nor would the bare fact that he received and cashed a check for a large amount, in and of itself, suffice to establish that income tax was due on account of it. On the other hand, if it be shown that a man had a business or calling of a lucrative nature and is constantly, day by day and month by month, receiving moneys and depositing them to his account and checking against them for his own uses, there is most potent testimony that he has income, and, *222 if the amount exceeds exemptions and deductions, that the income is taxable. * * * 25 See also United States v. Frank, 151 F. Supp. 866, 868-870 (W.D. Pa. 1956), affd. 245 F. 2d 284 (C.A. 3, 1957), certiorari denied 355 U.S. 819 (1957) (a criminal case); Goe v. Commissioner, 198 F. 2d 851, 852 (C.A. 3, 1952) (a civil fraud case); United States v. DeLucia, 262 F. 2d 610 (C.A. 7, 1958) (a criminal case); Conger v. United States, 188 F. Supp. 769, 772 (D. Neb. 1960) (a civil fraud case); United States v. Doyle, 234 F. 2d 788 (C.A. 7, 1956), certiorari denied 352 U.S. 893 (1956) (a criminal case); Escobar v. United States, 388 F. 2d 661, 667 (C.A. 5, 1967); certiorari denied 390 U.S. 1024 (1968) (a criminal case); and Mary Ruark T. C. Memo. 1969-48 (civil fraud and exception to the statute of limitations), affirmed per curiam 449 F. 2d 311, 312 (C.A. 9, 1971). In weighing the evidence on petitioner's private investigation business in 1960 and 1961 as a likely source of the bank deposits in those years, we have borne in mind the fact that *223 it was a new business. We have approached with extreme caution the question as to its income-generating capacity. However, after careful consideration of the entire record, we are convinced that respondent has shown petitioner was engaged in a "business or calling of a lucrative nature," Gleckman v. United States, supra at 399, in both 1960 and 1961 - a business which was, in the words of the Court of Appeals in the instant case (448 F. 2d at 975 fn. 2), "capable 26 of generating substantial receipts in excess of those reported." Petitioner testified that beginning in February 1960 when he received his license and continuing through 1961 and later years, he devoted his full time to his private investigation business. He testified that in this business, he conducted criminal, domestic, and business or industrial investigations. Although on remand petitioner sought to picture himself as a novice in this business in 1960, his testimony in this respect was not true. This was the type of work he had done for about two years, beginning in 1955 or 1956, under the business name of Central Bureau of Investigation. [5] In addition, in 1960 27 and later *224 years, part of his work consisted of the collection of bad checks for a percentage of the recoveries. [6]
*225 Petitioner launched the re-establishment of his private investigation business by sending letters to lawyers and businessmen, advising them of his investigative and check-collection services, making contacts with the police force, and advertising on the radio and in the yellow pages of the telephone directory issued in late 1960 or early 1961. He coupled his investigative work with the sale of electronic 28 surveillance equipment and burglar alarms. [7]
By its very nature, the private investigation business involves piecework assignments, and the fee is tailored to the job. Petitioner admitted that he received a fee of $300 from one of his jobs - evidently in 1960 or, in any event, during the period when he claimed he lacked experience. For conducting an investigation for the recovery of some jewelry for Raymond Salome in 1961, he admitted that he was paid a fee of $350. As set out in our Findings, respondent documented a transaction by petitioner in June and September *226 of 1961 in which a fee in excess of $3,700 was received from the Desert Hills Motor Hotel. That petitioner was able to earn such large fees in 1960 and 1961 demonstrates that his business was capable of generating substantially greater amounts of gross income than the $531.75 and the $4,651.95 reported for 1960 and 1961, respectively. That petitioner, by early fall of 1960, had moved his business for his home, rented an office, furnished it (two desks alone ($650) cost more than the gross income ($531.75) reported in 1960), and hired a secretary indicate that the business was a lucrative one. He did not make this move 29 because his efforts to establish his business with an office in his home had failed. To the contrary, he testified that the Central Bureau of Investigation failed because he lost control over expenses, and he sought to avoid the same mistake in handling The Investigators venture. The only reasonable inference is that his business had progressed to the point where this move in 1960, which entailed a considerable investment, was justified. Moreover, in addition to making large payments on the Cadillac automobile which he bought in 1959, and to buying a *227 Thunderbird convertible in July 1961 and another Cadillac in September 1961 (on all three of which he claimed depreciation deductions in his 1961 return), he expended substantial sums on his business during 1960 and 1961. As stated in our Findings, his 1960 tax return shows capital expenditures in that year (other than his Cadillac automobile) totaling $1,981, and the revenue agent verified other capital expenditures. His tax return for 1961 shows capital outlays in that year of $7,800 for a Cadillac convertible and $5,765 for a Thunderbird convertible. While the purchases of these automobiles were financed in part by loans, they reflect a substantial committment. Credit ordinarily is not extended to someone for such purpose unless he has income, and, as shown in our Findings, petitioner asserted in September 1961 that he was earning $20,000 per year. 30 Petitioners' 1960 return, moreover, shows business expense deductions totaling $1,931.02 (plus depreciation of $206.01); the revenue agent verified and the notice of deficiency allowed $1 additional expenses of $1,341.70, bringing the 1960 total expenditures, exclusive of depreciation, to $3,272.72. Petitioners' 1961 return *228 shows business expense deductions totaling $13,219.56 (plus depreciation of $3,446.56); the revenue agent verified (and the notice of deficiency allowed) additional expense deductions of $3,725.35, bringing the total expenditures, exclusive of depreciation, to $16,944.91. Petitioner's business telephone bill alone ($3,017.83) was over three-fifths of his reported gross income ($4,651.95) for 1961. His 1962 return, in which business deductions of $15,612.35 (plus depreciation of $2,437.97) were claimed (and the acquisition of another new Cadillac convertible in October 1962 was reflected), shows a continuation of the outlays of large amounts of funds. We do not cite these expenditures as direct evidence of income omissions. We recognize that a new business may lose money. But we think these expenditures throw revealing light on the magnitude and the income-producing capacity of petitioner's business. Many of them are the kinds of expenditures which are directly associated with the transaction of business. Had his business not been capable of generating substantial 31 amounts in excess of the gross income reported in his 1960 and 1961 returns, we do not think petitioner, *229 whether or not he had access to a large cash hoard, would have made these large expenditures. We think these continued outlays of funds support an inference that the business had sufficient income-producing capacity to be, and was, a likely source of the bank deposits in 1960 and 1961. We have noted that respondent introduced a written "Customer's Statement" submitted to the Lone Star Mortgage Company in September of 1961, in which petitioner represented that he had annual income of $20,000. Petitioner discounts this statement on the ground that it was filled out by a commission salesman who admitted it was his practice to use the largest income figure given by a customer. However, petitioner signed the statement prepared by the salesman, verifying the truthfulness of its contents. Moreover, its contents are not at wide variance with his representation to a friends in 1960 that his annual earnings amounted to more than $15,000. We think it incredible that petitioner could have obtained the credit to buy two expensive automobiles in 1961 if he had not had substantial net income, and certainly not, if he had been losing money at the rate he reported. [8]
*230 32 In view of all these facts, we think the only reasonable inference is that petitioners omitted from their 1960 and 1961 returns gross income in excess of 25 percent of the amount thereof stated in each of of those returns. The only logical conclusion is that Jay's business, The Investigators, was capable of generating substantially more income than was reported and that the likely source of those funds was that business. Moreover, as discussed below, we think respondent has shown that the 1960 and 1961 deposits in petitioner's bank accounts were not derived from funds which he had in his possession in previous years or to which he had access on January 1, 1960. (b) Specific omission, 1961. Respondent established, as noted in our Findings, that Edmund L. Given, then owner of the Desert Hills Motor Hotel, gave petitioner two checks in the total amount of $3,266.30, one dated June 8, 1961, and the other dated June 28, 1961. Both of these checks were deposited in petitioner's checking account maintained in the name of The Investigators. These and the two checks he received from the Desert Hills Motor Hotel in September 1961 covered an 33 investigation of the motel's *231 employees and the installation of certain equipment. Respondent has also shown that the two checks received in June 1961 were not included in petitioners' gross income for 1961. During the first six months of the year, the monthly cash summary sheets - from which the return was prepared - showed gross receipts totaling only $2,071, including only $346 for June 1961, the month in which these two Desert Hills Motor Hotel checks were received. For the next month - July 1961 - the monthly summary sheet showed receipts of only $417.80. The revenue agent, a qualified accountant, testified that his study of the cash summary sheets reflected that the amounts of these two checks were not entered on those sheets for 1961. Since the total amount of these two checks is so large in relation to the amount reported as income, the record amply supports his conclusion. [9]
*232 34 Section 6501(e) (1) (A) (i), quoted above, defines "gross income" to mean "the total of the amounts received or accrued from the sale of goods or services * * * prior to diminution by the cost of such sales or services." Although petitioner recognizes the existence of this provision, he attempts to circumvent it by arguing that he was not in the "trade or business" of selling equipment and that the equipment he installed at the Desert Hills Motor Hotel was either a capital asset or a section 1231 asset (property used in this trade or business). On this ground, he contends that only the actual gain he recognized on the sale could be viewed as omitted income under section 6501(e) (1) (A). Maintaining that there was no gain [10] on the transaction, he urges that no portion of the checks should be considered omitted income. *233 Petitioner's argument is a surprising one. His 1961 return contained an entry showing closing inventory in the amount of $3,714.72, evidence that he was selling something. Under ordinary tax accounting rules, petitioner would be 35 entitled to credit for an equal amount for opening inventory for 1962, the succeeding year, but the notice of deficiency for 1962 failed to give him credit for any opening inventory. (He claimed no such credit on his 1962 return.) The parties stipulated prior to the first trial that he was entitled to such an adjustment. During the course of petitioner's testimony at the first trial, he stated that this item was not an inventory of burglar alarms, as respondent's counsel stated he had thought, but represented the "inventory of office equipment, office and equipment." [11] In view of this testimony, respondent's counsel asked to be relieved of the stipulation on the ground that he had been misled. Petitioner's counsel objected and represented to the Court that petitioner would have an inventory of equipment "that he was going to install in the course of his doing work for * * * [his clients]" and referred specifically to Edmund Given's testimony *234 as an example. [12] In 36 view of this representation, we do not think it possible that this equipment was either a capital asset or a section 1231 asset. Se sections 1221(1) and 1231(b) (1) (A). We hold that the entire amount of the two June 1961 Desert Hills Motor *235 Hotel checks constitutes "gross income" as defined by section 6501(e) (1) (A) (i). Petitioner's failure to include the total amount of those checks in his reported gross income for 1961 constituted an omission of an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in the return. This is an additional reason to lift the bar of the statute of limitations for 1961. 37 2. Nontaxable Sources. The detailed testimony of the revenue agent shows that he made a reasonable effort to follow every lead given by petitioner during the course of the revenue agent's investigation as to any nontaxable sources of petitioner's large bank deposits and cash expenditures during 1960 and 1961. Respondent has shown that petitioner did not have access to a cash hoard at the beginning of 1960 in excess of the amounts for which he has been given credit. Respondent has also shown that such bank deposits and cash expenditures were not derived from any of the nontaxable sources claimed by petitioner. Petitioner established at the first trial that he received a maximum of $3,500 from real estate transactions involving his own property in 1958 *236 and 1959. The only reasonable inference, however, is that these funds were used for living expenses for petitioner, his wife, and two children, and for other family members, or were lost in his business ventures. During the period 1955 through 1959, he lost money in two unsuccessful business ventures, a private investigation business and a nightclub. During 1957, 1958, and 1959, he filed no income tax returns, and a revenue agent could not locate enough income to support a deficiency determination. He was unemployed for two years, evidently 1958 and 1959. In mid-1957, the El Paso National Bank wrote off a loan to him as 38 uncollectible. Obviously, he had living expenses during this period. From these facts, we do not think that whatever money he received from the 1958 and 1959 real estate sales was still available to him in 1960 and 1961. Albert N. Shahadi, 29 T.C. 1157, 1167-1168 (1958), affd. 266 F. 2d 495 (C.A. 3, 1959), certiorari denied 361 U.S. 874 (1959). Petitioner's lead concerning funds allegedly obtained from his father-in-law is a curious one. His father-in-law, after being hospitalized in late 1958, gave petitioner *237 a power of attorney to handle his business affairs. Pursuant to this agency, petitioner sold his father-in-law's house for $3,300 and cashed some pension checks between December 31, 1958, and September 17, 1959. Because he held this power of attorney, petitioner counts the proceeds of his father-in-law's real estate and pension checks as a nontaxable source of funds available to him in 1960 and 1961. The power of attorney merely authorized petitioner to act on behalf of his father-in-law. It did not entitle him to the funds. Indeed, the father-in-law sued petitioner on November 5, 1959, for misappropriation of the real estate proceeds of $3,300 and pension checks of approximately $900. After a preliminary hearing, the suit was dismissed. Although petitioner testified he did not repay his father-in-law any of this money, he also testified that he "used the money in my own personal 39 livelihood and for my family and for anything that * * * [h3] saw fit." More specifically, the evidence shows that petitioner bought a residence at 477 Crestwood Place in El Paso, as well as a Cadillac convertible automobile in 1959. He testified that his father-in-law gave him the money *238 for the downpayment on the house. The testimony indicates that this downpayment approximated the proceeds from the sale of the father-in-law's house. Rose testified that the downpayment was made with the proceeds from the sale of her father's house. Thus, the proceeds from the sale of Jay's father-in-law's real estate were not available for bank deposits or cash expenditures in 1960 or 1961. As to the amount of his father-in-law's retirement income while he lived with petitioners, the evidence contains inconsistencies. Petitioner testified it amounted to $390 to $450 per month, and Rose testified it amounted to $800 to $900 per month. But the testimony of disinterested witnesses shows that both of these estimates were gross exaggerations. According to an official of the City of El Paso, Ontiveros had received $30 per month from the City; other evidence shows that he had collected a pension of $84 (or $93) per month from the Railroad Retirement Board. In addition to these pensions, he received social security payments of $30 40 per month for his dependent daughter, Mary, and an additional social security monthly benefit for himself. Although the amount of the latter *239 was not precisely shown, the maximum social security payment in 1960 was $127. Sec. 215(b), Social Security Act, 42 U.S.C.A. 415(a), applicable to 1960. Thus, the largest amount that Ontiveros' retirement payments could have totaled was $280 ($30 $93 $30 $127) per month. And petitioner apparently did not receive even this amount, for the petition in the suit filed by Ontiveros against him on November 5, 1959, alleged that he wrongfully collected eight Railroad Retirement Board checks of $84 each and eight City of El Paso checks of $30 each, together with a payment of $3,300 from the State of Texas on the sale of real estate, but said nothing about social security checks. Since petitioner was unemployed and without sufficient income even to justify filing an income tax return for 1957, 1958, and 1959, it is obvious that whatever amount remained from money obtained from his father-in-law after making the downpayment on his house was used to support the members of his household. We think respondent has disproved petitioner's claim that on January 1, 1960, he had a cash hoard of moneys obtained from his father-in-law. Petitioner relies most heavily upon his *240 claim that he obtained large sums of money from his father. Petitioner 41 claimed this money came, in part, from funds his father allegedly received from the railroads or their insurer because of the 1946 accident in which petitioner was injured. The attorney who handled the claim for the railroads testified that the railroads did not have insurance and nothing was paid on the claim either through an award or settlement. He stated that in view of Texas law, the railroads required the entry of a judgment before any settlement could be made with a minor. An attorney from the law firm which represented petitioner testified that the firm's file on the case showed nothing was recovered. Notwithstanding petitioner's representations to the contrary, respondent has established that nothing was recovered on this claim. Petitioner also claimed that part of his bank deposits came from money his father had accumulated from his wages as a meat cutter. An examination of the record reveals the fallacy of this contention. In 1948, his father's wages were $30 to $35 per week. Petitioner testified that in 1955, they were $85 to $90 per week. Petitioner's mother had never worked outside *241 the home. Several witnesses testified that Jay's father had drunk heavily and was frequently out of work. Besides supporting himself and his wife, he had had five children who were dependent upon him for support until they could work. During the last five years of his life, he received free 42 outpatient care at a local hospital on 72 different occasions by representing that he was indigent. When he died, none of his other children inherited any money from him, and some of them gave petitioner approximately $1,500 to pay for their father's burial expenses. We think respondent has shown that petitioner's claim that his father gave him thousand of dollars in $2 bills and silver dollars is a pure fabrication. While members of petitioner's family attempted to do all they could to aid his cause, some of their testimony was damaging to his position. We think respondent has shown that, of all the money petitioner deposited, only the relatively small amounts referred to in our Findings were actually received from his father. [13]
*242 43 In remanding the instant case, the Court of Appeals suggested that, in addition to weighing respondent's evidence of a "likely source" of petitioner's large bank deposits, we consider "whether United States v. Massei, 355 U.S. 595, * * * is relevant to the Commissioner's burden on the statute of limitations issue." 448 F. 2d at 976 fn. 3. While we think, for the reasons stated above, that respondent has shown that petitioner's private investigation business was a likely source of the disputed deposits, we are also of the view the deficiency assessments may be sustained under the rationale of the Massei case. That case ( United States v. Massei, 355 U.S. 595 (1958)) must be viewed with a back drop of Holland v. United States, supra, where the Supreme Court, upholding the net-worth-increase method of income reconstruction, explained (348 U.S. at 137) that "evidence supporting the inference that the defendant's net worth increases are attributable to currently taxable income" was a requisite to the use of that method. As to the kind of evidence required to support such inference, where the Government had not *243 negatived all possible nontaxable sources of the alleged net worth increases, the Court explained (pp. 137-138): 44 Increases in net worth, standing alone, cannot be assumed to be attributable to currently taxable income. But proof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient. * * * This is not to say that the Government may disregard explanations of the defendant resonably susceptible of being checked. But where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant. * * * In Massei, the Court clarified its Holland opinion, explaining (p. 595) that "should all possible sources of nontaxable income be negatived, there would be no necessity for proof of a likely source." The Courts of Appeal have applied those principles in cases in which the Commissioner had the burden of proving fraud in order to sustain penalties under section 6653(b) and to lift the bar of the statute of limitations under section 6501(c) (1). In Gatling v. Commissioner, 286 F. 2d 139 (C.A. 4, 1961), *244 a civil fraud case where the taxpayer claimed a cash hoard as the explanation for his increases in net worth, the court said (p. 144): 45 Taxpayer complains that he was improperly charged with deficiencies on the strength of an analysis showing increases in his net worth without a showing of a probably source of unreported taxable receipts during the years in question. He relies principally upon Holland v. United States, 1954, 348 U.S. 121, * * *. However, he overlooks or refuses to accept the explanation of the Holland decision as found in United States v. Massei, 1958, 355 U.S. 595, * * *. In the Massei case it was held that the Government need not demonstrate a taxable source for the unreported receipts reflected in the net worth computation where all possible sources of nontaxable income have been negatived. Where taxpayer has committed himself to one specific explanation of the source of funds expended, the Government should not be required to waste time and resources in futilely attempting to negate possible nontaxable sources which have, in effect, been denied by taxpayer's claim of a particular source. * * * [Emphasis supplied in next to *245 last sentence, excepting word "nontaxable." ] As brought out in the Tax Court Memorandum Opinion in that case, the Commissioner had the burden of proving fraud in order to sustain section 6653(b) penalties, as well as to lift the bar of the statute of limitations under section 6501(c) (1). To the same effect, as brought out in the Tax Court Memorandum Opinions under these cases, see Commissioner v. Thomas, 261 F. 2d 643, 645-646 (C.A. 1, 1958), and Ferris v. Commissioner, 317 F. 2d 333, 334 (C.A. 2, 1963). See also Ehlers v. Vinal, 382 F. 2d 58, 63-64 (C.A. 8, 1967) (a civil fraud case). 46 We are convinced that respondent has shown petitioner's 1960 and 1961 bank deposits were not derived from the proceeds of sales of his own real estate which he made in 1958 and 1959, from moneys obtained from his father-in-law, or from moneys given to him by his father. These were the sources specified by petitioner during the investigation by the revenue agent and the proceedings of this case. Under the reasoning of Gatling, Thomas, Ferris, and Ehlers - all of which apply Massei - respondent has established facts from which it may reasonably *246 be concluded that the deposits in petitioner's bank accounts were derived from taxable sources. Our holding that respondent has carried his burden of proof is based on an examination of the record as a whole. We have considered each aspect of the case in light of its conformity to all the facts in the record and have accepted those parts that we believe are truthful. In analyzing the credibility of the witnesses' testimony, we have been guided not only by their verbal utterances but also by their demeanor in the courtroom. In this regard, we note that petitioner's responses to questions asked by respondent's counsel were characterized by continual vagueness, i.e., "I'm not sure" - "I don't know" - or "It could have been," a condition not plaguing his answers to questions by his own counsel. In many cases, his testimony 47 was in direct contradiction either to what he had previously said or to other facts clearly established in the record. [14] Petitioner's obvious attempt to slant the record in his own behalf convinces us that he was less than candid in his statements before this Court. *247 48 3. Amount of Understatements of Gross Receipts. Since section 6501(a) is not a bar to assessment, it was petitioners' burden to prove errors in the deficiencies determined by respondent. Wardy v. Commissioner, 396 F. 2d 792 (C.A. 5, 1968), affirming per curiam a Memorandum Opinion of this Court; and Jackson v. Commissioner, 380 F. 2d 661 (C.A. 6, 1967), certiorari denied 389 U.S. 1015 (1967). With the exception of the adjustments to cash expenditures reflected in our Findings, they have failed to do so. 4. Additions to Tax; Section 6653(a). As to the year 1960, the burden of proof on the addition to tax was on petitioners. Carroll F. Schroeder, 40 T.C. 30 (1963). They have failed to show that negligence or an intentional disregard of rules and regulations, within the meaning of section 6653(a), was not responsible for at least part of the underpayment for 1960. As to 1961, respondent amended his answer to include a claim for the section 6653(a) addition to tax. Since this was new matter, he bore the burden of proof. Rule 32, Tax Court Rules of Practice. By showing the inadequacy of petitioners' books and *248 records, the omission of specific items of gross income, and the omission of a substantial amount of income, 49 respondent has shown that negligence or an intentional disregard of rules and regulations caused at least part of the underpayment. To reflect the adjustments appearing in our Findings, Decision will be entered under Rule 50. Footnotes
1. To eliminate the remainder ($900) of Armas' deposits in his own account, plus interest ($17.53) thereon, which were included in respondent's computations, an additional adjustment of $917.53 should be made to petitioner's 1961 deposits. ↩
1. The revenue agent's investigation of original documents and receipts verified that during 1960, petitioner made cash payments of $682 on his residence, $1,264 on his cars, $100 on an M-1 carbine, $1,530.50 on office furniture, $500 on a telephone company deposit, and $35 on an electric company deposit, for a total of $4,111.50. Checks for capital items amounted to $2,663.90. ↩
2. In the notice of deficiency, respondent allowed total business deductions of $4,224.29 for 1960 instead of the amount claimed by petitioners. Part of this increased allowance for deductions included additions of $745.56 for depreciation, $133.68 for repair to car, $628.93 for equipment rental, $83.92 for stationery, $26 for miscellaneous, $403.79 for travel, and $49.95 for material for files. Of these expenses, $831 was paid by check. The revenue agent's investigation of original documents and receipts verified these additional expenditures. ↩
3. In the notice of deficiency, respondent allowed total business deductions of $18,965.01 for 1961 instead of the amount claimed by petitioners. This allowance included additional business expense deductions of $3,725.35 and a decrease of $1,426.46 for depreciation. ↩
4. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. ↩
5. Although petitioner testified at the trial on remand that he operated this business for only two or three months, we think the following testimony at the original trial is more believable: Q. All right, now. What was [sic] these years that you got this money from him [his father] in connection with the Central Bureau of Investigation? A. What were the years? It was on or about, it was '55 and after '55. Q. For about how many years? A. I don't know, the business was not in operation too long. Q. Could it have been more than two years? A. It could have been, yes, sir. Q. Would it have been as long as four years up to fifty-nine? A. No, Sir. With regard to the similarity of the two businesses, petitioner testified at the first trial as follows: Q. Was this business analogous to the one that you opened up in February of 1960 called The Investigators? A. Was it what, sir? Q. Was it analogous to the same - were you doing the same type of things in the Central Bureau of Investigation that you did in the early years of the operation of The Investigators? A. As far as activities for investigative performance, yes. ↩
6. Evidence of this check-collection work was not developed until the trial on remand. Petitioner tried to dismiss this evidence on the ground that he initially charged only 10 percent of each recovery, but he admitted that at some undisclosed later date, he charged 50 percent of the recovery. ↩
7. On remand, petitioner testified as to the sale of burglar alarms: "I remember the latter part of '61 when I came up with a product, the burglar alarm, that I cut a tape to advertise the burglar alarms." ↩
8. Although petitioners reported gross income of $4,651.95 in their 1961 return, they also claimed deductions (less than those actually verified by respondent) which produced a net loss of $12,014.17. In their 1960 return, they claimed deductions (less than those actually verified by respondent) which produced a net loss of $1,605.28 although their reported gross income was only $531.75. ↩
9. Even if the two June 1961 Desert Hills Motor Hotel checks, in some inexplicable way, were fed into the monthly summary sheets in months following July 1961, respondent has shown a 25-percent omission for 1961 within the meaning of sec. 6501(e) (1) (A) (i). The record shows specific amounts of gross income in excess of the $5,814.94 figure discussed above, computed as follows: ↩
Summary sheets, January through May 1961
$1,725.00
Summary sheet, June 1961
346.00
Summary sheet, July 1961
417.80
Desert Hills checks in June 1961
3,266.30
Desert Hills check, September 1, 1961
476.05
Desert Hills check, September 21, 1961
25.00
Raymond Salome fee, December 1961
350.00
$6,606.15
10. During the first trial of this case, petitioner testified that the two June 1961 checks were received in payment for equipment he installed at the Desert Hills Motor Hotel. He stated that, from these two checks, only the profit he received was reflected on his records and he was uncertain how much that was. At the second trial, he stated that he was paid less that what the equipment cost him. This testimony supports our conclusion that no part of these June 1961 checks was reflected on petitioner's books and records or included as gross income in his 1961 return. ↩
11. This testimony is patently erroneous. An examination of the 1961 return shows that this inventory item of $3,714.72 is not related to office equipment. In the schedule supporting the deduction for depreciation, there are items for "Firniture [sic] & Fixtures" of $1,932 and "Equipment" of $200.73. However, these figures cannot be related in any way to the inventory item. ↩
12. The following colloquy occurred: THE COURT: I was seeking some information yesterday as to just what the nature of this business was. In what circumstances would a detective agency have an inventory? MR. LEEPER: If he had equipment for his clients that he was going to install in the course of doing work for them. THE COURT: Making sales? MR. LEEPER: Yes, sir. In effect, because * * * [we] heard testimony by Mr. Given relative to the Desert Hills the other day, where Mr. Armes had installed equipment and left it there. ↩
13. Petitioner testified that his father's cash hoard, a seemingly inexhaustible supply of funds, was used to cover his losses in the Central Bureau of Investigation and The Office Lounge businesses during 1955 through 1959, as well as to provide most of the thousands of dollars reflected by the bank deposits and cash expenditures during 1960 through 1962. Petitioner testified that due to his father's alleged mistrust of banks, Armas had never deposited any of this cash hoard in any bank (although in 1961, he deposited his social security checks in a bank savings account in his own name). Rather, it was allegedly kept in "shoe boxes" and a "pirate chest," and petitioner asserted that at one point he placed an uncounted quantity of silver dollars in a bank vault. This testimony places demands upon credibility which pass all reasonable bounds. However, our decision that petitioner did not have access to this cash hoard in 1960 and 1961 is based upon what respondent has proved rather than upon the lack of plausibility of petitioner's testimony. ↩
14. The following are some examples of a few of the inconsistencies in petitioner's testimony or its contradiction of facts proved in the record. At one point, he mentioned a burglar alarm business as a possible source of income for the 1960, 1961, and 1962 period. Later, his testimony indicated he had burglar alarm income only during 1963 or 1964. He testified there was a profit on the investigation involving the sale of equipment to the Desert Hills Motor Hotel but that he was uncertain of the amount. At the trial on remand, he said he lost money on that transaction. He stated that during this period, he charged only $25 for domestic investigations, regardless of how much work was involved. Later, on redirect examination, he admitted that this was only his minimum fee and what he charged was different in every case. At one point, he indicated that the Central Bureau of Investigation was in operation for at least two years and the investigating activities he performed then were similar to what he did later in The Investigators. Subsequently, he said the earlier venture lasted for only two or three months and he gained no experience from it. He claimed his father recovered a substantial amount, through settlement or otherwise, due to the loss of Jay's hands. Disinterested witnesses (both the lawyer for the railroads as well as one from the firm which represented petitioner) testified that nothing was paid on the claim. He stated that a closing inventory for 1961 was composed of his office and equipment. His attorney later verified that it was actually an inventory of equipment that he would install for clients. Petitioner testified that after his father's death, he kept all his father's money and did not give any of it to his brothers and sisters. At an earlier point in time, he told a revenue agent that one brother and his sisters helped pay for their father's burial. ↩